**ACOMA OIL CORPORATION and Clarke D. Bassett Residuary Trust, Plaintiffs and Appellants,**

v.

**Clayton D. WILSON, Jr., Allan LeRoy Wilson, and Universal Resources Corporation, Defendants and Appellees.**

**Civ. No. 900412.**

Supreme Court of North Dakota.

June 3, 1991.

Dennis Edward Johnson, Watford City, for plaintiffs and appellants.

Richard P. Olson of Olson, Sturdevant & Burns, Minot, for defendants and appellees Clayton D. Wilson, Jr. and Allan LeRoy Wilson.

Jon Bogner of Kubik, Bogner, Ridl & Selinger, Dickinson, for defendant and appellee Universal Resources Corp.

ERICKSTAD, Chief Justice.

Acoma Oil Corporation (Acoma) and the Clarke D. Bassett Residuary Trust (Bassett), appeal from a district court judgment declaring that the current mineral interest owners in a 160–acre tract of land proportionately share the burden of prior assignments of a 6.5% royalty. We reverse and remand for further proceedings.

In 1915 H.O. Moen obtained fee simple title to the 160–acre tract of land in McKenzie County described as:

Township 153 North, Range 95 West
Section 20: NW¼

In 1937 Moen made three separate royalty conveyances, cumulatively transferring a 6.5% royalty of all oil and gas produced from the 160 acres, to third parties. The primary dispute in this case is whether the burden of that 6.5% royalty is proportionately shared by the current mineral interest owners.

Moen and his wife conveyed the 160 acres to Clayton D. Wilson, Sr., by warranty deed dated December 18, 1944, and recorded February 7, 1945. Moens' warranty deed did not reserve any mineral interests or mention the prior royalty assignments. Clayton, Sr., then conveyed the 160 acres to himself and his wife, Alma E. Wilson, as joint tenants. The parties to this lawsuit all obtained their interest in the 160 acres through conveyances originating from Clayton, Sr., and Alma Wilson.

By separate mineral deeds, both dated June 17, 1952, and recorded on June 26, 1952, Clayton, Sr., and Alma conveyed an "undivided $^{35}/_{320}$th" and "an undivided $^{5}/_{320}$th interest in and to all the oil, gas, casinghead gas, casinghead gasoline and other minerals in and under" the N½ of Section 20 to Thomas W. Leach. The two mineral deeds identified a specific intent to convey 35 and 5 "mineral acres," respectively, in the N½ of Section 20. Neither mineral deed indicated that the conveyed interest was burdened by the outstanding 6.5% royalty. Both mineral deeds included the following warranty language:

"TO HAVE AND TO HOLD, The above described property and easement with all and singular the rights, privileges, and appurtenances thereunto or in any wise belonging to the said Grantee herein his heirs, successors, personal representatives, administrators, executors, and assigns forever, and Grantor do hereby warrant said title to Grantee his heirs, executors, administrators, personal representatives, successors and assigns forever and do hereby agree to defend all

and singular the said property unto the said Grantee herein his heirs, successors, executors, personal representatives, and assigns against every person whomsoever claiming or to claim the same or any part thereof."

Leach obtained a title opinion, dated June 21, 1952, which noted the outstanding 6.5% royalty in the NW¼ of Section 20.

In July 1952 Leach executed a mineral deed to United Properties Incorporated (United), conveying "an undivided ¹⁸⁄₃₂₀ths interest in and to all oil, gas, casinghead gas, casinghead gasoline and other minerals in and under" the N½ of Section 20. The deed expressed an intent to convey "18 full mineral acres" and said that Leach agreed to "warrant and defend the title" but that he would not "be liable for a breach of warranty in an amount exceeding the actual consideration received" by him. In 1966 United conveyed that interest to Acoma by a mineral deed which included similar warranties. The deeds from Leach to United and from United to Acoma do not refer to the outstanding 6.5% royalty.

Leach also conveyed "an undivided ⁹⁄₃₂₀ths interest in and to all of the oil, gas, casinghead gas, casinghead gasoline and other minerals in and under" the N½ of Section 20 to Clarke D. Bassett by mineral deed dated June 24, 1952. That mineral deed expressed an intent to convey "9 full mineral acres" and also said that Leach agreed to "warrant and defend the title" but that he would not "be liable for a breach of warranty in an amount exceeding the actual consideration received" by him. That mineral deed does not refer to the outstanding 6.5% royalty. Clarke later conveyed a ³⁄₃₂₀th interest in the N½ of Section 20 to Arthur Fitzloff. Clarke's remaining mineral interest, a ⁶⁄₃₂₀th interest in

the N½ of Section 20, was transferred to the Bassett Trust by a quiet title judgment dated January 3, 1986.

When Clayton, Sr., died on February 8, 1978, his interest in the NW¼ of Section 20 passed to his wife, Alma, as joint tenant. Alma died on March 11, 1984, and by probate of her estate and a personal representative's deed of distribution from her estate, dated November 25, 1986, and recorded December 16, 1986, her interest in the NW¼ of Section 20 passed to her sons, Clayton D. Wilson, Jr. and Allan LeRoy Wilson (the Wilson children), with each getting an undivided ½ interest.

Universal Resources Corporation (Universal) has operated a producing oil and gas well on the NW¼ of Section 20 since 1983. A dispute arose as to whether the burden of the 6.5% royalty should be shared proportionately by Acoma, Bassett,[1] and the Wilson interests, or entirely by the Wilsons. Acoma commenced this action against the Wilson children for breach of warranty and to quiet title. Acoma sought a determination that its mineral interests in the 160–acre tract of land were not burdened by the 6.5% royalty and that the Wilson interests were burdened by that royalty. Acoma also sued Universal, seeking an accounting and recovery of overpayments by Universal to the Wilsons. Bassett intervened as a plaintiff, essentially raising the same claims and seeking the same relief as Acoma.

The parties submitted stipulated facts to the trial court. The court concluded that the rationale of *Duhig et al. v. Peavy-Moore Lumber Co.*, 135 Tex. 503, 144 S.W.2d 878 (1940), was not applicable to this fact situation. The court observed that equitable estoppel[2] applied to fact sit-

---

1. The decimal equivalent of Acoma's interest in proceeds from the well with a proportionate reduction for the royalty is .0104062 and without a proportionate reduction for the royalty is .0140625. The decimal equivalent of Bassett's interest in proceeds from the well with a proportionate reduction for the royalty is .0022969 and without a proportionate reduction for the royalty is .00351563.

2. The trial court quoted the following "equitable estoppel" test to determine whether or not a grantor should be estopped from asserting title:

"1. The party making the admission by his declaration or conduct was appraised of the true state of his own title;

"2. That he made the admission with the express intention to deceive or with such careless and culpable negligence as to amount to constructive fraud;

uations which did not conform to the classic *Duhig* scenario. The trial court applied equitable estoppel and determined that Leach was aware of the outstanding 6.5% royalty because of a contemporaneous title opinion and that he was not "destitute of all knowledge of the true state of the title [and] of the means of acquiring such knowledge." The court concluded that "[e]quity dictates that the royalty burden of six and a half percent created in 1937 by the former owner, Moen, be proportioned among the present mineral owners." The court further determined that the plaintiffs' action was untimely under Section 28–01–15, N.D.C.C.[3]

■ We initially consider the trial court's determination that the 6.5% royalty should be proportionately shared by the present mineral owners. Acoma and Bassett contend that the trial court erred in determining that *Duhig, supra,* was not applicable and in determining that equitable estoppel dictated a proportionate sharing of the 6.5% royalty by the present mineral owners. Relying on *Duhig,* they argue that the Wilson interests should bear the entire burden of the 6.5% royalty, because Clayton, Sr., and Alma had sufficient remaining mineral interests to satisfy the outstanding 6.5% royalty when they made their conveyances to Leach.

The defendants respond that *Duhig* is not applicable to this case because there was no mineral reservation clause in the mineral deeds from Clayton, Sr., and Alma

to Leach. They argue that the trial court correctly determined that the 6.5% royalty should be shared proportionately under equitable estoppel because Leach had actual or constructive knowledge of the outstanding royalty.

Under *Duhig* " 'a grantor who, by warranty deed, purports to convey a fractional mineral interest is estopped from asserting title to a reserved fractional mineral interest in contradiction to the interest purportedly conveyed.' " *Mau v. Schwan,* 460 N.W.2d 131, 133 (N.D.1990), *citing Sibert v. Kubas,* 357 N.W.2d 495, 496 n. 1 (N.D.1984). *See generally* 1 Williams & Meyers, Oil & Gas Law § 311 et seq. (1990).

In *Duhig,* a third party owned an outstanding ½ mineral interest in certain land and the grantor owned the surface and the remaining ½ mineral interest. The grantor conveyed the surface to the grantee by warranty deed with a reservation of ½ interest in all the minerals under the surface. The grantor and grantee both claimed the ½ mineral interest that was not owned by the third party. The Texas Supreme Court concluded that the grantee owned the surface and a ½ mineral interest, the third party owned the outstanding ½ mineral interest, and the grantor owned nothing.

In reaching that conclusion, the court employed a two-step analysis under principles of estoppel.[4] The court observed that

"3. The other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge;
"4. That he relied directly upon such admission and will be injured by allowing its truth to be disproved;"
*See Wehner v. Schroeder,* 354 N.W.2d 674 (N.D.1984); *Gilbertson v. Charlson,* 301 N.W.2d 144 (N.D.1981).

**3.** Section 28–01–15, N.D.C.C., provides:
"*Actions having ten-year limitations.* The following actions must be commenced within ten years after the claim for relief has accrued:

\* \* \* \* \* \*

"2. An action upon a contract contained in any conveyance or mortgage of or instrument affecting the title to real property except a covenant of warranty, an action upon which

must be commenced within ten years after the final decision against the title of the covenantor...."

**4.** The court's decision was expressed in one opinion authored by Commissioner Smedley. However, that opinion indicates that although some members of the court did not write separate opinions, they employed different rationales to reach the same result.

Commissioner Smedley stated his conclusion that "the language of the deed as a whole does not clearly and plainly disclose the intention of the parties that there be reserved to the grantor ... an undivided one-half interest in the minerals in addition to that previously reserved to" the third party and that resort to established rules of construction indicated that the "intention of the parties to the deed was to invest the grantee with title to the surface and a one-half

the grant clause gave the grantee all of the surface and a ½ mineral interest but that the reservation clause reserved a ½ mineral interest in the grantor. Because the grantor purported to retain a ½ mineral interest and the other ½ mineral interest was owned by a third party, the grantor breached the clause warranting title to a ½ mineral interest. By analogy to the doctrine of estoppel by deed against assertion of an after-acquired title, the court held that the grantor was estopped to assert the reservation of a ½ mineral interest.

*Duhig* resolves a conflict between grant and reservation clauses under principles of estoppel by warranty, a subset of estoppel by deed, which precludes a warrantor of title from disputing the title warranted. *Mau, supra.* The effect of *Duhig* is that a grantor cannot grant and reserve the same mineral interest, and if a grantor does not own a large enough mineral interest to satisfy both the grant and the reservation, the grant must be satisfied first because the obligation incurred by the grant is superior to the reservation. *Mau v. Schwan, supra; Sibert v. Kubas, supra; Kadrmas v. Sauvageau,* 188 N.W.2d 753 (N.D.1971); *see* 1 Williams & Meyers, *supra* at § 311; Willis, 28 Rocky Mt. Min. Law Institute, 947 (1983).

We followed the *Duhig* rationale in *Kadrmas, supra.* Although we then limited our application of *Duhig* in *Gilbertson v. Charlson,* 301 N.W.2d 144 (N.D.1981), our decision in *Sibert, supra,* 357 N.W.2d at 497, indicates that *Gilbertson* was limited to "the peculiar facts of that case wherein the grantee, prior to the disputed conveyance, owned an outstanding mineral interest in the property conveyed." We held that "[a]bsent a *Gilbertson* fact situation, a grantee's notice, actual or constructive, of a third party's outstanding mineral interest does not jeopardize his rights against a grantor who has made a convey-

ance to him by warranty deed." *Id.* at 498. *See also Mau, supra.*

As we explained in *Sibert, supra,* 357 N.W.2d at 497:

" 'If the grantor has warranted title to land he purports to convey, and if the breach of warranty can be remedied by taking the land from the grantor and giving it to the grantee, then there is no reason for refusing to do so in a title action, whether or not styled as one for breach of warranty. The key question is, not what the grantor purported to retain for himself, but what he purported to give to the grantee. If he undertook to convey half the minerals and had the power to do so, he should be held to his undertaking. The risk of title loss is on the grantor in a warranty deed; ...' "

In *Mau, supra,* we observed that several North Dakota statutes reinforced the result in *Duhig.*

Section 47–09–13, N.D.C.C., provides: *"Grant shall be interpreted in favor of grantee—Exceptions.*—A grant shall be interpreted in favor of the grantee, except that a reservation in any grant, and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor."

Section 47–09–16, N.D.C.C., provides: *"Transfer vests actual title—Thing includes incidents.*—A transfer vests in the transferee all the actual title to the thing transferred which the transferor then has unless a different intention is expressed or is necessarily implied. It also transfers all its incidents unless expressly excepted, but the transfer of an incident to a thing does not transfer the thing itself."

Section 47–10–08, N.D.C.C., provides: *"Grant conclusive against whom.*—Every grant of an estate in real property is conclusive against the grantor and every one subsequently claiming under him, ex-

interest in the minerals, excepting or withholding from the operation of the conveyance only the one-half interest" held by the third party. *Duhig, supra,* 144 S.W.2d at 879–880.

However, Commissioner Smedley's opinion indicates that the decision of the majority of the court was based upon estoppel. *Id.* at 880. *See* 1 Williams & Meyers, *supra,* at § 311; Professor Willis A. Ellis, "Rethinking the Duhig Doctrine", 28 Rocky Mt. Min. Law Institute, 947, 950–951 (1983).

cept a purchaser or encumbrancer who in good faith and for a valuable consideration acquires a title or lien by an instrument that first is duly recorded."

In this case the plaintiffs obtained their mineral interests by conveyances originating from the Wilson parents' transfer to Leach. We thus look to that conveyance to determine the applicability of *Duhig* and those statutes to this case because estoppel by deed precludes a party to a deed and privies from asserting against another party and privies any right or title in derogation of the deed, or from denying the truth of any material facts asserted in the deed. *Kadrmas, supra.*[5] *See also* 28 Am. Jur.2d, Estoppel and Waiver § 4 (1966). That analysis is supported by the language of Section 47–10–08, N.D.C.C., that "[e]very grant of an estate in real property is conclusive against the grantor and everyone subsequently claiming under him."

The parties to this action are successors in interest to the Wilson parents. The Wilson parents conveyed an "undivided" fractional "interest in and to all the oil, gas, casinghead gas, casinghead gasoline and other minerals in and under" the NW¼ of Section 20 to Leach. Those mineral deeds included language stating a specific intent to convey 35 and 5 "mineral acres," respectively, in the N½ of Section 20. Neither deed indicated that the mineral acres were burdened by the outstanding 6.5% royalty and each deed included language granting a warranty of title.

A mineral acre is the full mineral interest in one acre of land. 8 Williams & Meyers, Manual of Terms, p. 561 (1987). A mineral interest is a property interest created after an oil and gas severance from the surface and generally includes the right to sell all or part of the estate, the right to explore and develop the estate, the right to execute oil and gas leases, and the right to create fractional shares of the mineral estate. 1

Williams & Meyers, *supra,* at § 301; 8 Williams & Meyers, *supra,* at p. 562. Mineral rights generally include those same basic interests. 8 Williams & Meyers, *supra,* at p. 563. A royalty interest is a smaller interest in a mineral estate which is a share of the product or proceeds reserved to the owner for permitting another to develop or use the property. 1 Williams & Meyers, *supra,* at § 301; 8 Williams & Meyers, *supra,* at p. 564. Mineral and royalty interests are separate property interests with different characteristics. *Texaro Oil Co. v. Mosser,* 299 N.W.2d 191 (N.D.1980). Although royalty interests are part of the full spectrum of a mineral estate, the interest in minerals in place and the interest in royalty based on the production of those minerals are separate and distinct estates. *Selman v. Bristow,* 402 S.W.2d 520 (Tex.Civ.App.1966).

Instruments conveying "mineral acres" generally have been construed to convey the full spectrum of oil and gas rights recognized in the law [1 Williams & Meyers, *supra,* at § 304.3], and instruments granting interests in oil, gas and other minerals "in and under" described land have also been construed to convey full mineral interests. *Id.* at § 304.4. In this case, the mineral deeds from the Wilson parents to Leach warranted conveyances of "mineral acres" and interests in oil, gas, and other minerals "in and under" the 160 acres. The Wilson parents thus warranted conveyances of an undivided fraction of the full bundle of mineral rights in the 160–acre tract of land to Leach. After the conveyances to Leach, the Wilson parents owned enough royalty interest in that tract of land to satisfy the previous 6.5% royalty assignments made by Moen without a reduction of any royalty from the "mineral acres" conveyed to Leach.

Under those circumstances, we believe that Sections 47–09–13, 47–09–16 and 47–

---

**5.** Universal asserts that Leach's conveyances to his successors in interest were under a "limited warranty" because he attempted to limit his liability to the actual consideration paid to him, in the event of a breach of warranty. However, Leach's deeds to his successors "agree[d] to warrant and defend the title ... against any of his acts or deeds adverse thereto" and only purported to limit his liability for a breach of that warranty. Leach's deeds to his successors in interest do not include language indicating conveyances of anything other than the kind of mineral interests he received from the Wilson parents.

10–08, N.D.C.C., and the *Duhig* rationale are applicable to the Wilson parents' conveyances of mineral acres to Leach. Like *Duhig*, in cases where a grantor conveys some mineral interests while keeping some mineral interests in the same tract of land without an explicit reservation, the focus is on whether or not the grantor has enough mineral interests in that tract of land to satisfy the conveyance. *See Sibert, supra.* We believe that result follows under our law even though the Wilson parents' mineral deeds did not contain a specific reservation clause because "a grant [without a reservation] shall be interpreted in favor of the grantee" [Section 47–09–13, N.D.C.C.] and "a conveyance of land, without any exception or reservation of the minerals constitutes a conveyance of 100 percent of the minerals as well as the surface." *Sibert supra*, 357 N.W.2d at 496, citing *Schulz v. Hauck*, 312 N.W.2d 360 (N.D.1981). *See* 1 Williams & Meyers, *supra* § 309 [Deeds without Reservation or Exception].

We are not persuaded that equitable estoppel and Leach's actual or constructive knowledge of the outstanding 6.5% royalty is applicable to this case because the Wilson parents owned enough mineral interests in the 160–acre tract of land to fulfill their grant to Leach. *See Sibert, supra* [grantee's actual or constructive notice of a third party's outstanding mineral interest does not jeopardize a grantee's rights against a grantor who has made a conveyance by warranty deed].

*Wehner v. Schroeder*, 354 N.W.2d 674 (N.D.1984),[6] is distinguishable. In that case there was a discrepancy between two instruments executed by the original grantor and grantee which should have given a successor in interest sufficient notice of a potential problem to prompt further investigation. Here, the record title shows that there was an outstanding 6.5% royalty in the 160 acres, but the Wilson parents' mineral deeds do not indicate that the mineral acres conveyed by them were burdened by that royalty and they owned enough remaining mineral interests in that land to fulfill their grant of mineral acres to Leach. Leach's actual or constructive knowledge of the outstanding 6.5% royalty does not diminish the Wilson parents' warranty because the risk of title loss is on the grantor.[7] *Sibert, supra.* We conclude that *Duhig* and our previously cited statutory provisions govern this case.

Other courts have used the *Duhig* rationale to conclude that conveyances of undivided fractional mineral interests in a tract of land were not proportionately burdened by prior royalty conveyances. *Atlantic Refining Co. v. Beach*, 78 N.M. 634, 436 P.2d 107 (1968); *Selman v. Bristow*, 402 S.W.2d 520 (Tex.Civ.App.1966).

*Selman* involved an action to determine ownership of mineral rights under a 92.2–acre tract of land. Weeden initially sold the land to the Bristows and reserved ⅛ of the royalty. The Bristows then sold the land to the Selmans by warranty deed in which the Bristows reserved ¼ of the mineral interest. The Bristows contended that

**6.** We are aware of the analysis of our "equitable estoppel" decisions in *Wehner* and *Gilbertson*. *See* Richard C. Maxwell, "Some Comments on North Dakota Oil and Gas Law—Three Cases From the Eighties," 58 N.D.L.Rev. 431 (1982); Willis A. Ellis, "Rethinking the Duhig Doctrine," 28 Rocky Mtn. Min. Law Institute 947 (1983); Lisa B. Plumly, "Conveyances of Fractional Interests: North Dakota Supreme Court Repudiates the Duhig Rule, Gilbertson v. Charlson," 17 Tulsa Law Journal 117 (1981); Owen L. Anderson and Charles T. Edin, "The Growing Uncertainty of Real Estate Titles," 65 N.D.L.Rev. 1 (1989).

The elements of estoppel by deed and equitable estoppel are different [compare 28 Am. Jur.2d, Estoppel and Waiver, §§ 5 and 35], and

it has been stated that it is a mistake to equate an estoppel by deed to an estoppel in pais. 28 Am.Jur.2d, Estoppel and Waiver § 4, citing *McAdams v. Bailey*, 169 Ind. 518, 82 N.E. 1057 (1907).

**7.** The Wilson parents did not breach their warranty because they retained enough mineral interests in the 160–acre tract of land to convey an undivided fraction of the full mineral acres in the property to Leach. Because there was no breach of warranty, the limitation period of Section 28–01–15(2), N.D.C.C., does not bar this action. This is essentially a quiet title action to determine ownership of the mineral interests. Consequently, that statute is not applicable. *Sabot v. Fox*, 272 N.W.2d 280 (N.D.1978).

Weeden's ⅛ royalty was attributable to the entire mineral estate and that each of the mineral owners in the tract of land were required to bear the burden of the royalty in proportion to their respective ownership of the mineral interest. The Texas Court of Civil Appeals held that Weeden's ⅛ royalty was attributable to the Bristows' ¼ mineral interest and was not borne proportionately by the Selmans' undivided ¾th mineral interest.

The court quoted the general rule that a deed passes whatever interest the grantor has in the land unless words are used to show an intent to convey a smaller estate. *See* Section 47–09–16, N.D.C.C. The court noted the distinction between a mineral interest and a royalty interest, and relying upon principles from *Duhig,* concluded:

> "Prior to their conveyance to Selman, Bristow[s] ... owned 100% of the minerals in place. They could not, however, because of the outstanding royalty interest, convey to Selman[s] the full fee simple title to the full ¾ths of the minerals and yet at the same time reserve ¼th of the minerals for themselves. Obviously, to give effect to both the grant and the reservation would be impossible. In such a situation, the rule is that if both grant and reservation cannot be given effect, the grant prevails and the reservation fails.

> \*  \*  \*  \*  \*  \*

> "[T]heir reservation left them with more than enough minerals and royalty to satisfy the previous royalty reservation without effecting their conveyance to Selman of a full ¾ths of the minerals. Since the grantors undertook to convey a full ¾ths of the minerals and had the power to do so, they will be held to this undertaking. The deed was therefore effective to convey to Selman the surface and an unencumbered, unrestricted ¾ths of the minerals....

> "Although Bristow[s] ... had knowledge of the Weeden royalty reservation, nevertheless they chose to warrant the title to Selman, and thereby assumed the risk of failure of title....

> "While the covenants of general warranty cannot be construed as enlarging the title conveyed or impairing the grantors' title to ¼th of the minerals reserved to them, the warranty operates as an estoppel denying to the grantors the right to set up their ¼th undivided interest in the mineral estate against the grantee's title to the ¾ths undivided interest therein." *Selman, supra,* 402 S.W.2d at 524 [citations omitted].

*Atlantic Refining, supra,* 436 P.2d 107, involved a quiet title action in which the grantor, Price, had conveyed a ½ of ⅛ royalty in land to a third party, Kitchen. Price then granted the surface and ¹⁵⁄₃₂ of the minerals to LeMond and reserved ¹⁷⁄₃₂ of the minerals. Relying upon principles from *Duhig,* the New Mexico Supreme Court said:

> "It is equally apparent that the [¹⁷⁄₃₂] reservation left the grantors [Price] with enough minerals and royalty to satisfy the previous royalty grant without affecting the conveyance to LeMond of a full ¹⁵⁄₃₂ of the minerals unburdened by the Kitchen royalty interest. The grantors having warranted a full ¹⁵⁄₃₂ of the minerals and having the right to do so will be held to that undertaking.

> "If the deed should be interpreted to reserve to the grantors a full ¹⁷⁄₃₂ of the minerals unburdened by ½ of the royalty theretofore conveyed to Kitchen, the warranty would be breached by the grantor at the very moment of its execution because the deed warrants the title to the surface estate and to ¹⁵⁄₃₂ of the minerals, free and clear of all encumbrances; but, in this instance, the grantor, by reserving a ¹⁷⁄₃₂ interest in the minerals, reserved to himself mineral rights out of which the royalties already conveyed were to be satisfied....

> "Reading all of the provisions of the Price–LeMond deed together makes it clear that there was conveyed to LeMond ¹⁵⁄₃₂ of the minerals unburdened by the Kitchen royalty interest. Price reserved from the LeMond conveyance ¹⁷⁄₃₂ of the oil and gas mineral fee, subject to the entire burden of the Kitchen royalty interest. The covenant of warranty does

not affect or impair that title so reserved.

"Our construction of these deeds merely relieves LeMond and his grantees of the burden of any part of the royalty interest held by Kitchen and his grantees." *Atlantic Refining Company, supra,* 436 P.2d at 112 [citations omitted].

The rationale of *Selman* and *Atlantic Refining* is consistent with our statutory provisions and *Duhig.* When the Wilson parents conveyed the mineral acres to Leach, they retained ownership of enough mineral interests in the 160–acre tract of land to satisfy the prior 6.5% royalty assignment without burdening the interest conveyed to Leach. Because the Wilson parents owned enough mineral interests in the 160–acre tract of land to fully satisfy their conveyances to Leach, we conclude that the interests of Leach's successors in interest, Acoma and the Bassett Trust, are not burdened by the 6.5% royalty. 1 Williams & Meyers, *supra* at § 317. *Compare Amundson v. Gordon,* 134 Mont. 142, 328 P.2d 630, 632 (1958) [proportionate sharing of prior royalty where contract for sale said that "any oil and mineral rights now owned by the parties of the first part ... [are] to be divided equally"]. We therefore conclude that the trial court erred in determining that the 6.5% royalty should be proportionately shared by Acoma and Bassett.

■ Acoma and Bassett also assert that they are entitled to proceeds from the well from the date of first run without a proportionate reduction for the 6.5% royalty. Acoma and Bassett argue that Universal is liable to them for overpayments to the Wilsons. Universal responds that, pursuant to a title opinion and division orders executed by the Wilsons and Acoma, it paid out 100% of the proceeds owed to Alma Wilson, the Wilson children, Bassett, and Acoma. Universal thus argues that it is not liable to Acoma or Bassett because it has received no benefit and has not been unjustly enriched. Universal argues that Acoma's and Bassett's remedy for underpayment is against the overpaid party and not the operator. The Wilson children argue that they are not liable for any overpayments.

We agree with Acoma and Bassett that they are entitled to proceeds from the well from the date of first run without a proportionate reduction for the 6.5% royalty. However, because the trial court did not decide issues about the parties' ultimate responsibility for the 6.5% royalty from the date of first run, we remand to the trial court for a determination of these issues. In remanding to the trial court, we observe that the different status of Acoma and Bassett vis-a-vis executed division orders requires a different analysis of the ultimate responsibility for their claims.

In *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 691–692 (Tex.1986), the Texas Supreme Court summarized the law on payments under division and transfer orders:

"Division orders provide a procedure for distributing the proceeds from the sale of oil and gas. They authorize and direct to whom and in what proportion to distribute funds from the sale of oil and gas.... Transfer orders are later changes in the division order's distribution....

"In Texas, division and transfer orders do not convey royalty interests; they do not rewrite or supplant leases or deeds.... The weight of authority clearly supports this rule....

"The general rule in Texas, though, is that division and transfer orders bind underpaid royalty owners until revoked.... One principle underlining this rule is detrimental reliance....

"Detrimental reliance explains why purchasers and operators are usually protected by the rule that division orders are binding until revoked. In the typical case, purchasers and operators following division orders pay out the correct total of proceeds owed, but err in the distribution, overpaying some royalty owners and underpaying others. If underpaid royalty owners' suits against purchasers and operators were not estopped, purchasers and operators would pay the amount of the overpayment twice—once

to the overpaid royalty owner under the division order and again to the underpaid royalty owner through his suit. They would have double liability for the amount of the overpayment.... Exposing purchasers and operators to double liability is unfair, because they have relied upon the division order's representations and have not personally benefited from the errors.

"Generally, the underpaid royalty owners, however, have a remedy: they can recover from the overpaid royalty owners.... The basis for recovery is unjust enrichment; the overpaid royalty owner is not entitled to the royalties...." [Citations omitted].

*See also Wagner v. Sunray Mid–Continent Oil Co.,* 182 Kan. 81, 318 P.2d 1039 (1957); *Foertsch v. Schaus,* 477 N.E.2d 566 (Ind.Ct.App.1985).

In 1983 Universal began production from the well on the NW¼ of Section 20. Universal obtained a title opinion that the 6.5% royalty was proportionately shared by the mineral owners and, in 1983, prepared division orders [8] pursuant to that opinion. The division orders reflected that Acoma's decimal equivalent in production was .0104062, which corresponded to its mineral interest reduced by a proportionate share of the 6.5% royalty. Acoma signed the division order and received payments under that order from May 1983 through June 1984 when it informed Universal by telephone that its interest should be changed to .0140625. According to Universal, it assumed that a clerical error had been made by transposing the third and fourth numbers in Acoma's interest, and on June 3, 1984, Acoma signed a new division order reflecting the revised mineral interest. The parties agree that the revised division order corresponded to Acoma's interest without a proportionate reduction for the

6.5% royalty. From June 1984 through May 1986, Universal paid Acoma based upon the June 1984 revised division order. Universal discovered the mistake in 1986 and then held Acoma's payments in suspense to recoup the difference between the two division orders.

■ Acoma is not entitled to recover underpayments from Universal from 1983 through May 1984 because, during that time, Universal paid Acoma pursuant to an executed division order. *Gavenda, supra.* Acoma may be entitled to recover from the overpaid mineral owners for that amount. However, we note that the Wilson children did not acquire their interest in the property until November 1986, and the property was owned by Alma during that time. Because the trial court did not decide the ultimate responsibility for underpayments from 1983 through May 1984, we remand for determination of that issue.

The revised division order correctly stated the decimal equivalent of Acoma's interest in proceeds from the well, and Acoma was entitled to keep payments made by Universal at that rate. Universal incorrectly suspended payments in May 1986 to recoup the difference between the two division orders. After May 1986, there was apparently no executed division order by Acoma in effect. After May 1986, Acoma was entitled to proceeds from Universal without a proportionate reduction for the 6.5% royalty. However, the record is unclear about the amount of payments made or held in suspense after that time and a remand to the trial court is necessary to determine the proceeds, with interest at the legal rate, due to Acoma for that time period.

When Universal began production from the well in 1983, Clarke D. Bassett was the record owner of the Bassett Trust's inter-

---

**8.** Section 47–16–39.3, N.D.C.C., defines division orders:

"*Division orders—Definition, function, and operation.* A division order is an instrument executed by the operator, the royalty owners, and any other person having an interest in the production directing the purchaser of oil or gas to pay for the products taken in the proportions set out in the instrument. Royalty payments may not be withheld because an interest owner has not executed a division order. A division order may not alter or amend the terms of the oil and gas lease. A division order that varies the terms of the oil and gas lease is invalid to the extent of the variance and the terms of the oil and gas lease take precedence."

est. However, Clarke had died and Universal did not receive proof that his interest had passed to the Bassett Trust until February 1986. Universal apparently held the proceeds from the well in suspense from the date of first production through February 1986 because of a quiet title action by the Bassett Trust. When Universal received notice of the quiet title judgment it sent a division order to the Bassett Trust crediting it with a .0022969 interest, reflecting the decimal equivalent of a proportionate sharing of the 6.5% royalty. The Bassett Trust disputed its interest and did not sign the division order. In December 1987, the Bassett Trust requested payment on a .00351563 interest which reflected the decimal equivalent of its interest with no proportionate reduction for the 6.5% royalty. The Bassett Trust also requested interest pursuant to Section 47–16–39.1, N.D.C.C.[9] Universal offered to pay the Bassett Trust for a .0022969 interest. The Bassett Trust then requested payment on the undisputed portion of its mineral interest (.0022969) with interest at 18%. In January 1988 Universal paid the Bassett Trust based upon a proportionate reduction for the 6.5% royalty (.0022969) and also paid 18% interest under protest.

■ The Bassett Trust did not execute a division order. In the absence of an executed division order by the Trust, we do not believe that Universal's reliance on the title opinion and division orders executed by the other parties absolves it from underpaying the Bassett Trust. We therefore conclude that the Bassett Trust may recover underpayments from Universal. We express no opinion on the ultimate liability for any payments that Universal must make to the Bassett Trust. Because there was a dispute over whose mineral interests were subject to the burden of the 6.5% royalty, the Bassett Trust is not entitled to interest under Section 47–16–39.1, N.D.C.C., on the disputed portion of the proceeds. The Bassett Trust is entitled to interest under Section 47–16–39.1, N.D.C.C., on any undisputed proceeds which were withheld after the date Universal received proof of the February 1986 quiet title judgment. Because this record is not clear about the payments actually made by Universal to the Bassett Trust and pursuant to the foregoing, we remand to the district court for appropriate determinations on the amount due to the Bassett Trust.

The district court judgment is reversed, and we remand for further proceedings consistent with this opinion.

GIERKE, LEVINE, MESCHKE and VANDE WALLE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

Because, as the majority opinion recognizes, mineral and royalty interests are separate property interests with different characteristics, *Texaro Oil Co. v. Mosser*, 299 N.W.2d 191 (N.D.1990), it would not be unreasonable to conclude, as did the district court, that the burden of the 6.5%

---

9. Section 47–16–39.1, N.D.C.C., provides:
   "*Obligation to pay royalties—Breach.* The obligation arising under an oil and gas lease to pay oil or gas royalties to the mineral owner or his assignee, or to deliver oil or gas to a purchaser to the credit of such mineral owner or his assignee, or to pay the market value thereof is of the essence in the lease contract, and breach of such obligation may constitute grounds for the cancellation of such lease in such cases where it is determined by the court that the equities of the case require cancellation. In the event the operator under an oil and gas lease fails to pay oil or gas royalties to the mineral owner or his assignee within one hundred fifty days after oil or gas produced under the lease is marketed and cancellation of the lease is not sought, the unpaid royalties shall thereafter bear interest at the rate of eighteen percent per annum until paid. Provided, that the operator may remit semiannually to a person entitled to royalties the aggregate of six months' monthly royalties where the aggregate amount is less than fifty dollars. The district court for the county in which the oil or gas well is located shall have jurisdiction over all proceedings brought pursuant to this section. The prevailing party in any proceeding brought pursuant to this section shall be entitled to recover any court costs and reasonable attorney's fees. This section shall not apply when mineral owners or their assignees elect to take their proportionate share of production in kind, or in the event of a dispute of title existing which would effect distribution of royalty payments."

royalty assignment was to be shared by all the owners of mineral acres in the 160 acres. Sullivan, in his *Handbook of Oil and Gas Law,* observes that "[a]s with mineral deeds, royalty conveyances take the form of designated fractions or a specified number of royalty acres. The same reasons for preferring royalty acres to a designated fractional interest apply in the case of royalty conveyances as in the case of mineral deeds." In discussing the description in mineral acres at section 115 of his work, Sullivan observes:

"In the matter of describing the fractional interest conveyed, consideration should be given to whether a stipulated fraction should be used ... or whether the specified number of undivided acres out of the tract should be used.... When the conveyance is of a specified undivided fractional interest, *the grant is made with respect to each part of the described premises,* and a failure of title to a part of the land *will decrease proportionately* the interest acquired by the grantee. On the other hand, where the conveyance is of a specified number of mineral acres, the grantee would be entitled to the full number of mineral acres out of whatever the grantor owned. If the grantor owned more than the number of acres recited in the deed, of course, the use of a designated fraction would effect a proportionate increase in the interest acquired by the mineral grantee." (Emphasis supplied.)

The same rationale might be applied here. But, insofar as there is a question as to who should bear the burden of the 6.5% royalty interest under the facts of this case, I concur with the majority that as a matter of equity heirs who take through the original grantor should bear the burden of the royalty interest in contrast to purchasers for value from the original grantor of a specified number of mineral acres. In this respect the equitable principles comparable to those applied in *Mau v. Schwan,* 460 N.W.2d 131 (N.D.1990), and cases cited therein, are applicable.

Under a different set of facts, for example where the original grantor, after conveying a royalty interest conveys all the grantor's remaining mineral acres or conveys mineral acres to the extent that the grantor no longer retains sufficient interest to satisfy the previously conveyed royalty interest, the result would be different. I write separately to note that the majority opinion does not, nor does it purport to resolve those factual situations. In such instances, depending upon the facts, the burden of the previously conveyed royalty interest might well be shared proportionately by the present mineral owners.