2013 ND 17

**A.G. GOLDEN; Paul E. Nordstog; Cooper B. Land; Solveig K. Land; Howard D. Armentrout and Delores K. Armentrout, as Co–Trustees of the Armentrout Family Revocable Living Trust dated May 24, 2005; Craig L. Bolenbaugh, and Joseph Michael Bolenbaugh, Peter Francis Bolenbaugh, and James Patrick Bolenbaugh, as joint tenants; and Royalty Interest Partnership, LP, Plaintiffs and Appellees**

v.

**SM ENERGY COMPANY, a Delaware corporation, Defendant and Appellant.**

No. 20120265.

Supreme Court of North Dakota.

Feb. 1, 2013.

Amy L. DeKok (argued), Jillian R. Rupnow (appeared), and Lawrence Bender (on brief), Bismarck, ND, for plaintiffs and appellees.

David R. Hammond (argued), and Natalie West (on brief), Denver, CO; and H. Malcolm Pippin (appeared), Williston, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] SM Energy Company appealed from a summary judgment declaring that A.G. Golden and other plaintiffs are entitled to a four percent overriding royalty interest in leases and lands covered by a 1970 letter agreement and ordering SM to pay amounts due to Golden and the other plaintiffs for these interests, and from an order denying SM's motion to amend or for relief from the judgment. We conclude the district court erred in ruling as a matter of law that SM, through its predecessors in interest, expressly assumed an "area of mutual interest" clause in the 1970 letter agreement and in expanding the judgment to include unpled and unlitigated properties within the area of mutual interest. We further conclude the court correctly ruled as a matter of law that SM owes Golden and the other plaintiffs retroactive royalty payments on production from a certain well located on the subject property. We affirm in part, reverse in part, and remand for further proceedings.

I

[¶ 2] Golden owned oil and gas leases covering property located in McKenzie County. On July 15, 1970, Golden entered into a letter agreement with Universal Resources Corporation in which he sold Universal his "entire interest in these lands" for $15,000 "subject to my retention of four percent (4%) overriding royalty." The letter agreement also created a "joint area of interest":

A joint area of interest is designated between the parties hereto and is described as All of Sections 19, 20, 29, 30, 31 and 32 in Township 153 North, Range 95 West and All of Section 2 in Township 152 North, Range 96 West. It is agreed that should A.G. Golden purchase any leasehold interest within the above descirbed [sic] area, he will offer it at cost to Universal Resources Corporation, subject to a reservation of four per cent (4%) overriding royalty. Should Universal Resources Corporation purchase any leasehold interest in the joint area of interest, they will assign a four percent (4%) overriding royalty to A.G. Golden without cost. Said joint area of interest is shown by Exhibit "B" (attached hereto and made a part hereof).... Should production be encountered on any acreage owned or controlled by Universal Resources Corporation in the joint area of interest, the obligations of the parties hereto shall continue to each other for so long as

production continues.... The terms of this paragraph shall extend to all new lease purchases, lease renewals lease extensions of any nature whatsoever.

The letter agreement further provided that "[a]ny assignment of this agreement made by you [Universal] shall recite that same is made pursuant and subject to the terms and conditions of this Agreement." During the early 1980s, Universal acquired several leases within the geographic area defined in the letter agreement, including what the parties refer to as the "Thompson lease," and assigned to Golden a four percent overriding royalty interest in that lease and other leases in the joint area of interest.

[¶ 3] On April 29, 1993, Universal sold and assigned to Tipperary Petroleum Company its interest in the leases and lands covered by the 1970 letter agreement. The assignment and bill of sale included a provision that Universal was assigning "all right, title and interest of Assignor in and to ... all operating agreements, joint venture agreements, partnership agreements, and other contracts, to the extent that they relate to any of the Assets." A few months later, Tipperary acquired through an assignment from Texaco Exploration and Production, Inc., all of Texaco's interest in what the parties refer to as the "Federal lease." Effective March 1, 2000, Tipperary sold and assigned all of its interest in the leases and lands subject to the letter agreement, including the Thompson lease and the Federal lease, and its contract rights and obligations in the letter agreement, to Nance Petroleum Corporation. The assignment and bill of sale provided that Nance "assumes all of Assignor's duties, liabilities and obligations relating to the Assets to which Assignor was a party or by which it was bound on and after the date hereof." Nance was later merged into SM. All of

the relevant documents in this case were duly recorded.

[¶ 4] SM is the current operator of the "Thompson–Federal" well and the "Wilson" well. The drill site spacing unit for the Thompson–Federal well includes the Thompson lease and the Federal lease. The Wilson well is located within the joint area of interest. SM has paid Golden and the other plaintiffs royalties on production from the Thompson–Federal well attributable to the Thompson lease, but has not paid royalties on production attributable to the Federal lease. SM has paid Golden and the other plaintiffs a four percent overriding royalty on production from the Wilson well since January 2009, but has refused to pay them the four percent royalty for earlier periods because SM's previous smaller payments were made under executed division orders. Golden and the other plaintiffs brought this declaratory judgment action to determine the parties' rights, to quiet title to interests in the land, and for an accounting.

[¶ 5] The district court granted summary judgment in favor of Golden and the other plaintiffs and denied SM's cross-motion for summary judgment in its favor. The court ruled as a matter of law that SM, through its predecessors in interest, expressly assumed Universal's rights and obligations under the 1970 letter agreement. The court's judgment also expanded the scope of the ruling beyond the pleadings to include all leases and wells in the joint area of interest described in the letter agreement. The court further ruled as a matter of law that SM owes Golden and the other plaintiffs retroactive royalty payments on production from the Wilson well. The court denied SM's post-judgment motion to amend and for relief from the judgment.

## II

[¶ 6] SM argues the district court erred in granting summary judgment in favor of Golden and the other plaintiffs (collectively "Golden"). SM contends summary judgment should have been granted in its favor.

[¶ 7] The standard for reviewing summary judgments is well established:

> Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

*Hamilton v. Woll*, 2012 ND 238, ¶ 9, 823 N.W.2d 754 (quoting *Wenco v. EOG Resources, Inc.*, 2012 ND 219, ¶ 8, 822 N.W.2d 701).

### A

[¶ 8] SM argues the district court erred in granting summary judgment in favor of Golden because, as a matter of law, neither SM nor its predecessors in interest assumed the "joint area of interest" clause in the 1970 letter agreement.

[¶ 9] The "joint area of interest" clause in the 1970 letter agreement is commonly referred to in the oil and gas industry as an area of mutual interest or AMI agreement, which has been defined as an "agreement by which the parties attempt to describe a geographical area within which they agree to share certain additional leases or other interests acquired by any of them in the future." 8 P. Martin & B. Kramer, *Williams & Meyers Oil and Gas Law, Manual of Oil and Gas Terms* 54 (2012); *see also* A. Himebaugh, *An Overview of Oil and Gas Contracts in the Williston Basin*, 59 N.D. L. Rev. 7, 32–33 (1983). The parties in this case agree that the AMI clause is not a covenant that runs with the land, but is a personal covenant that is enforceable only between the original parties to the agreement. *See generally Beeter v. Sawyer Disposal LLC*, 2009 ND 153, ¶ 10, 771 N.W.2d 282; *compare Mountain West Mines, Inc. v. Cleveland–Cliffs Iron Co.*, 376 F.Supp.2d 1298, 1304–08 (D.Wyo.2005), *aff'd in part and rev'd in part on other grounds*, 470 F.3d 947 (10th Cir.2006) (AMI clause was not intended by the parties to be a covenant running with the land). Consequently, the parties agree that SM and its predecessors in interest must have agreed to be bound by the AMI clause under the law of assignments.

[¶ 10] Assignment agreements may not only assign rights, but may also delegate duties to the assignee. *See Rosenberg v. Son, Inc.*, 491 N.W.2d 71, 73 n. 1 (N.D.1992). An assignment is an expression of intention by the assignor that his duty shall immediately pass to the assignee, and the benefitted party's consent to the transfer can be manifested either expressly or by implication. *Estate*

*of Murphy*, 554 N.W.2d 432, 436 (N.D. 1996). An assignee is responsible only for the obligations of the assignor which the assignee contracts to undertake. *See Collection Ctr., Inc. v. Bydal*, 2011 ND 63, ¶ 16, 795 N.W.2d 667; *Skinner v. Scholes*, 59 N.D. 181, 188, 229 N.W. 114, 116 (1930); *see also Mountain W. Mines, Inc.*, 470 F.3d at 953 (generally, a party is not liable for an obligation under a contract except by his consent); *Grimes v. Walsh & Watts, Inc.*, 649 S.W.2d 724, 727 (Tex.Ct.App. 1983) (purported assignees must voluntarily agree to assume the burden represented by an area of interest covenant). As explained in 6A C.J.S. *Assignments* § 94, 485–86 (2004) (footnotes omitted):

> An assignment of contractual rights does not necessarily carry with it a delegation of contractual duties, even if the assigned contract specified that it was binding on the assigns of the parties to the contract. Where an assignee of a contract makes it known to the assignor that he or she did not intend by accepting the assignment to assume the assignor's duties and obligations under the contact, the duties and obligations are not delegated and the assignee makes no implied promise to perform them. The mere assignment of a bilateral executory contract may not be interpreted as a promise by the assignee to assume the performance of the assignor's duty. However, where it is clearly the intent of the parties, the assignee also succeeds to the obligations of the contract. This intent may be manifested by the parties' conduct, the subject matter of the contract, the language of the assignment, or the surrounding circumstances. The court will consider the totality of the fact situation. An assumption of obligations may be implied from an acceptance of benefits or the performance of duties under the contract.

[¶ 11] The general rules of contract law governing assignments also apply to AMI clauses:

> If an assignee takes an interest in oil and gas leases and the document of conveyance states that it is specifically subject to the terms of a contract wherein the area of mutual interest was created, and the assignee operates under the agreement or attempts to use or enforce the terms of that contract, it is submitted that the assignee has assumed the obligations of the area of mutual interest and it is enforceable against him. Whether or not these obligations were assumed by a party acquiring oil and gas leases subject to an area of mutual interest clause is a question of intent, and all the surrounding circumstances must be evaluated to determine that intent.

D. Zarlengo, *Area of Mutual Interest Clauses Regarding Oil and Gas Properties: Analysis, Drafting, and Procedure*, 28 Rocky Mtn. Min. L. Inst. 837, 859–60 (1983). The interpretation of assignments, like the interpretation of contract terms generally, is a question of the intent of the parties and is typically a question of fact for the trier of fact. *See Orion Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1138 (9th Cir.2001). However, where an assignment is memorialized in a clear and unambiguous writing, a court should not look to extrinsic evidence to ascertain intent. *See Knott v. McDonald's Corp.*, 147 F.3d 1065, 1067 (9th Cir.1998).

[¶ 12] In analyzing the issue, the parties and the district court focused on the 1993 assignment from Universal to Tipperary, which provided in relevant part that "Assignor . . . does hereby grant, sell, assign, convey, and deliver unto Assignee, all right, title and interest of Assignor in and to . . . all operating agreements, joint venture agreements, partnership agree-

ments, and other contracts, to the extent that they relate to any of the Assets." Golden argues this provision unambiguously establishes that SM assumed the AMI clause because Tipperary acknowledged when it acquired the leases from Universal that the acquisition was subject to the terms of "other contracts" that "relate to" the conveyed leases; that the "other contracts" included the 1970 letter agreement; and therefore the letter agreement, including the AMI clause, "relate[s] to" the assets conveyed under Universal's assignment. SM argues this provision unambiguously establishes that no assumption of the AMI clause occurred because the assignment "reflects the parties' intent to carefully limit the assignment of any agreement 'to the extent' that it related to one of the leases being assigned," and that the AMI clause did not "relate to" properties Universal had previously acquired and was assigning to Tipperary, but only to properties "that *Universal* might acquire in the future." The court adopted the interpretation offered by Golden, concluding the "Letter Agreement is a contract that 'relates' to the leases and lands covered by the Assignment from Universal to Tipperary and therefore, the rights and obligations under the Letter Agreement were transferred from Universal to Tipperary." The court did not address the "to the extent" language relied upon by SM.

[¶ 13] A contract is ambiguous when rational arguments can be made for different interpretations. *Nichols v. Goughnour*, 2012 ND 178, ¶ 12, 820 N.W.2d 740. If a contract is ambiguous, extrinsic evidence may be considered to clarify the parties' intentions. *Gawryluk v. Poynter*, 2002 ND 205, ¶ 9, 654 N.W.2d 400. Whether a contract is ambiguous is a question of law for the court to decide, and on appeal we independently review a con-

tract to determine if it is ambiguous. *Nichols*, at ¶ 12. Here, the parties have made rational arguments in support of their contrary positions as to the meaning of the language in question. We conclude the contested provisions of the 1993 assignment are ambiguous and the district court erred in interpreting the provisions as a matter of law. The resolution of the parties' intent is a question of fact, which is inappropriate for summary judgment. *See Langer v. Bartholomay*, 2008 ND 40, ¶ 12, 745 N.W.2d 649.

[¶ 14] The district court also concluded that summary judgment in favor of Golden was proper because the letter agreement was duly recorded, and therefore, Tipperary "had constructive knowledge of its existence and its terms" when Universal and Tipperary executed the assignment. Although Tipperary may have had constructive notice of the letter agreement, the inquiry here is whether SM, through its predecessor, Tipperary, agreed to be bound by the terms of the letter agreement. Tipperary's constructive notice of the letter agreement does not establish that it agreed to be bound by its terms. *Compare Grimes* 649 S.W.2d at 727 ("While it is true that reference made in the . . . agreement to the Plaintiff's agreement with Lovelady put the Defendants upon notice of the interest acquired by Lovelady, we fail to see that the Defendants voluntarily agreed to assume the burden represented by the area of interest covenant.")

[¶ 15] The district court further ruled that Tipperary was bound by all of the obligations imposed by the letter agreement under N.D.C.C. § 9–03–25, which provides that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or

ought to be known to the person accepting." The court reasoned:

> Universal assigned the benefits of the Letter Agreement to Tipperary in 1993. Since the Letter Agreement, with both of its Exhibits, was of record in McKenzie County long before the Assignment from Universal to Tipperary, the "facts" of the Letter Agreement and its "obligations" would have been known, or ought to have been known, by Tipperary when it accepted the assignment of leases and contracts from Universal. By accepting the benefits of the Letter Agreement, Tipperary also consented to "all the obligations arising from" the Letter Agreement—including the obligation to convey an overriding royalty to Golden on any leases it acquired in the joint area of interest.

[¶ 16] The district court adopted Golden's argument that Tipperary's execution of the 1993 assignment from Universal is the act that constituted Tipperary's voluntary acceptance of the benefit of a transaction. The court's conclusion that the mere act of entering into a transaction itself is the voluntary acceptance of the benefit of the transaction turns the law of assignments on its head. This construction of the statute turns the AMI clause, as well as any other personal covenant, into a covenant that runs with the land and obliterates the requirement that an assignee consent to be responsible for the obligations of the assignor. *See, e.g., Bydal,* 2011 ND 63, ¶ 16, 795 N.W.2d 667. Statutes are not to be read in isolation or applied in a vacuum, and we must consider the practical effects of a particular construction and avoid absurd or ludicrous results. *D & P Terminal, Inc. v. City of Fargo,* 2012 ND 149, ¶ 17, 819 N.W.2d 491. Section 9–03–25, N.D.C.C., by referring to "facts" that "are known or ought to be known to the person accepting," obviously contemplates extrinsic evidence of conduct

after completion of the transaction that suggests a voluntary acceptance of the benefit of the transaction. *See, e.g., Westby v. Schmidt,* 2010 ND 44, ¶ 24, 779 N.W.2d 681 (corporation knowingly and voluntarily accepted benefits of contract where it "billed Westby for the work on the house and accepted his payments under the contract"). Neither the court nor Golden has pointed to any evidence of conduct on the part of SM that is inconsistent with its interpretation of the assignment. The court's analysis begs the question of assignment rather than resolves it.

[¶ 17] Moreover, whether one has voluntarily accepted a benefit of a transaction under N.D.C.C. § 9–03–25 is a question better suited for trial before a trier of fact than for summary judgment disposition. *See Westby,* 2010 ND 44, ¶ 24, 779 N.W.2d 681 (jury trial); *B.J. Kadrmas, Inc. v. Oxbow Energy, LLC,* 2007 ND 12, ¶¶ 13–18, 727 N.W.2d 270 (bench trial); *Lonesome Dove Petroleum, Inc. v. Nelson,* 2000 ND 104, ¶¶ 24–26, 611 N.W.2d 154 (bench trial). As suggested in 6A C.J.S. *Assignments* § 94, 485–86 (2004), and D. Zarlengo, *Area of Mutual Interest Clauses Regarding Oil and Gas Properties: Analysis, Drafting, and Procedure,* 28 Rocky Mtn. Min. L. Inst. 837, 859–60 (1983), the principle enunciated in N.D.C.C. § 9–03–25 is simply part of the totality of circumstances to be considered by the court in deciding the parties' intentions.

[¶ 18] Summary judgment should not be used to conduct mini-trials of factual issues. *See Hamilton,* 2012 ND 238, ¶ 13, 823 N.W.2d 754. Because the disputed provision of the 1993 assignment permits reasonable differing interpretations, we conclude the district court erred in granting summary judgment on the question and we remand for trial where the court may consider extrinsic evidence

to clarify the relevant parties' intentions. If no further evidence can be produced at trial that was not already before the court, the parties may provide a stipulation of facts and exhibits, together with any argument permitted, for trial based on the record submitted. *See Hamilton,* at ¶ 20 (Crothers, J., concurring specially).

## B

[¶ 19] SM argues the district court erred in granting Golden relief as to other lease interests and properties that were not the subject of this litigation.

[¶ 20] Contrary to the district court's instructions, Golden prepared the judgment in this case and expanded the scope of the court's decision to include wells within the entire area of mutual interest which were not pled in the complaint. In its order denying SM's motion to amend and for relief from the judgment, the court acknowledged that Golden and the other plaintiffs had not followed its instructions and instead expanded the scope of the ruling, making it "broader than the case as filed." The court nevertheless approved the expanded judgment, reasoning "it simply makes no sense to say that the Plaintiff must relinquish this exact issue for each and every well."

[¶ 21] A district court cannot grant relief based on issues that are neither pleaded nor voluntarily litigated. *Soby Constr., Inc. v. Skjonsby Truck Line, Inc.,* 275 N.W.2d 336, 340 (N.D.1979), *overruled on other grounds in Shark v. Thompson,* 373 N.W.2d 859 (N.D.1985). Here, the court recognized that the legal status of the additional lease interests and wells were not voluntarily litigated by the consent of the parties. Moreover, this case involves property interests and the complaint sought quiet title relief. The expanded judgment would not be binding on any persons having interests in the

additional lease interests and wells belatedly added to the judgment who were not made parties to the action. *See Nord v. Herrman,* 2001 ND 11, ¶ 14, 621 N.W.2d 332; *Woodland v. Woodland,* 147 N.W.2d 590, 602 (N.D.1966).

[¶ 22] We conclude the district court erred in expanding the judgment to include unpled and unlitigated properties within the area of mutual interest.

## C

[¶ 23] SM argues the district court erred in awarding Golden retroactive royalty payments on production from the Wilson well. SM does not contest its obligation to pay Golden royalties on the Wilson well, nor does SM deny that Golden was underpaid. Rather, SM argues this Court's decision in *Acoma Oil Corp. v. Wilson,* 471 N.W.2d 476 (N.D.1991) ("*Acoma*"), stands for the proposition that "a working interest owner is not required to compensate royalty owners for underpayments if, as here, they executed a division order stating the percentage upon which they were paid."

[¶ 24] *Acoma* involved a situation in which a well operator overpaid some and underpaid other working interest owners, but had paid out 100 percent of the well proceeds under a title opinion and division orders executed by the working interest owners. 471 N.W.2d at 484. The well operator contended that it was not liable for the underpayments because it had received no benefit and had not been unjustly enriched, and argued the underpaid working interest owners' remedy was against the overpaid party. *Id.* This Court agreed with the well operator's position:

"Detrimental reliance explains why purchasers and operators are usually protected by the rule that division orders are binding until revoked. In the

typical case, purchasers and operators following division orders pay out the correct total of proceeds owed, but err in the distribution, overpaying some royalty owners and underpaying others. If underpaid royalty owners' suits against purchasers and operators were not estopped, purchasers and operators would pay the amount of the overpayment twice—once to the overpaid royalty owner under the division order and again to the underpaid royalty owner through his suit. They would have double liability for the amount of the overpayment.... Exposing purchasers and operators to double liability is unfair, because they have relied upon the division order's representations and have not personally benefited from the errors.

"Generally, the underpaid royalty owners, however, have a remedy: they can recover from the overpaid royalty owners.... The basis for recovery is unjust enrichment; the overpaid royalty owner is not entitled to the royalties...." [Citations omitted].

*Id.* at 484–85 (quoting *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 692 (Tex. 1986)).

[¶ 25] *Acoma* does not hold that a well operator is automatically insulated from liability for underpayment of royalties simply because the incorrect payments were made in accordance with an executed division order. *See* N.D.C.C. § 47–16–39.3 ("A division order that varies the terms of the oil and gas lease is invalid to the extent of the variance and the terms of the oil and gas lease take precedence."). Rather, the right to recovery depends upon the equitable principles of detrimental reliance and unjust enrichment. *Acoma,* 471 N.W.2d at 484–85. *Acoma* is distinguishable from this case. Here, it is undisputed that SM is the well operator that prepared the division order and SM is also the overpaid working interest owner. Because Golden was underpaid during the relevant time period and SM was overpaid, Golden has suffered harm and SM has been unjustly enriched by retaining the benefits of the erroneous division order and receiving the payments to which Golden was entitled.

[¶ 26] We conclude the district court correctly ruled as a matter of law that SM owes Golden retroactive royalty payments on production from the Wilson well.

### III

[¶ 27] We do not address other arguments raised because they either are unnecessary to the decision or are without merit. We affirm the summary judgment in part, reverse in part, and remand for further proceedings.

[¶ 28] LISA K. FAIR McEVERS, D.J., and WILLIAM F. HODNY, S.J., and CAROL RONNING KAPSNER and MARY MUEHLEN MARING, JJ., concur.

[¶ 29] The Honorable LISA K. FAIR McEVERS, D.J., and the Honorable WILLIAM F. HODNY, S.J., sitting in place of CROTHERS, J., and SANDSTROM, J., disqualified.