**Opinion filed May 18, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00060-CV

_____

## PERDIDO PROPERTIES LLC, ON BEHALF OF AND AS ATTORNEY-IN-FACT FOR PAUL H. BREMER, JR. AND LEON C. SMITHERMAN, JR., Appellant

## V.

## DEVON ENERGY PRODUCTION COMPANY, L.P., ET AL., Appellees[1]

**On Appeal from the 358th District Court**

**Ector County, Texas**

**Trial Court Cause No. B-17-10-1187-CV**

**O P I N I O N**

---

[1]P&J Energy, Inc.; Paula Watson Lakamp; Lawrence B. Watson, individually and as trustee of the Watson Family Trust; and Leslie Watson Fisette, collectively "the Watson Group" are also Appellees to this action. However, Appellant Perdido Properties LLC does not challenge the summary judgment granted in favor of the Watson Group.

This is an appeal from orders granting summary judgment in favor of Appellee Devon Energy Production Company, L.P. It involves claims for the nonpayment of mineral royalties to Leon C. Smitherman, Jr. and Paul H. Bremer, Jr. Appellant, Perdido Properties LLC, brought the underlying suit on behalf of Smitherman Jr. and Bremer Jr. as their attorney-in-fact. The trial court determined that Smitherman, Jr. and Bremer, Jr. were not entitled to recover under any theory alleged. In four issues, Perdido challenges this determination. We affirm in part, and reverse and remand in part.

*Background Facts*

This case concerns the ownership of a royalty interest in Ector County known as the "Bray Interest" that is attributable to Pauline Bray. On August 27, 1945, Raymond D. Savageau conveyed a royalty interest in certain tracts of land to Ross Bray in Ector County.[2] Ross Bray died before the relevant events in this case. In his last will and testament, Ross Bray bequeathed the residuary of his estate, which included the Bray Interest, as follows: (1) 75% to Pauline Bray (Bray's wife); (2) 12.5% to Ethel B. McConnell (Bray's sister); and (3) 12.5% to Mable B. Renney (Bray's sister).

On September 2, 1969, Pauline Bray died intestate in Denver. She was survived by her husband at the time, Leon Smitherman, Sr., and her siblings, Clair Bremer and William Watson a/k/a William Doane Watson. Smitherman Jr. claims through Leon Smitherman and Bremer Jr. claims through Clair Bremer.

In 2008, Devon became the operator on the leases covering the Bray Interest. Devon remained as the operator on those leases until 2016. In 2009, Devon obtained

_____

[2]Savageau conveyed the following royalty interest: (1) an undivided 304/100,000 royalty interest in Section 48, Block 42, Township 2 South; (2) an undivided 168/100,000 interest in Section 45, Block 42, Township 2 South, Texas and Pacific Railway Company Original Grantee; (3) an undivided 174/100,000 royalty interest in Sections 46 and 47, Block 42, Township 2 South, Texas and Pacific Railway Company Original Grantee; and (4) an undivided 174/100,000 royalty interest in Sections 1, 2, 3, 4, 10, 14, 15, 16 and 23 in Block 42 Township 3 South, Texas and Pacific Railway Company Original Grantee.

a title opinion that linked Pauline Bray to the Bray Interest. Devon held the royalties attributable to the Bray Interest in suspense because it was unable to determine the identity of Pauline Bray's heirs.

On September 29, 2010, Enerlex, Inc. e-mailed Devon that it "[had] acquired ¼ of the right, title and interest of Pauline W. Bray from her heir, William Doane Watson." Enerlex attached a deed where William Watson conveyed all of his interest in Ector County to Enerlex. Enerlex also attached a copy of a recorded affidavit of heirship that Anita Watson executed. The affidavit of heirship reflected that Pauline Bray died intestate and that, at the time of her death, she was survived by her husband Leon Smitherman Sr.; her brother, William Watson; and her sister, Clair Bremer.

In October 2010, William Watson's daughter, Leslie Watson Fisette, contacted Devon. In their conversation, Fisettee notified Devon that there may be an issue regarding the validity of William Watson's deed to Enerlex. During this time, Devon continued to hold the proceeds attributable to the Bray Interest in suspense.

In April 2011, attorney Jacob De Leon, on behalf of William Watson, sent a demand letter to Devon. In De Leon's letter to Devon, he included the following instruments: (1) a power of attorney signed by Lawrence Watson on behalf of his father, William Watson; (2) the Anita Watson affidavit of heirship; and (3) tax records from Ector County. De Leon demanded that Devon pay the proceeds due to the "heirs of Pauline Bray" to William Watson and De Leon's law firm. In spite of De Leon's demand letter, Devon continued to hold the proceeds attributable to the Bray Interest in suspense.

Following Devon's refusal to distribute the Bray Interest proceeds, Lawrence Watson, as court appointed conservator of William Watson, filed suit in the 244th District Court of Ector County against both Devon and Enerlex seeking to set aside

the 2009 deed. Lawrence Watson pleaded that, at the time William Watson entered into the 2009 deed, William Watson was "legally incapacitated and legally incompetent and has been legally incapable of entering into . . . deeds since at least 2007."

On October 2, 2012, William Watson, Devon, and Enerlex entered into an agreed judgment. The Agreed Judgment set aside the 2009 deed from William Watson to Enerlex, and it required that Lawrence Watson, on behalf of William Watson, deliver "properly drafted division orders" to Devon. William Watson's division order reflected that 100% of the Bray Interest was payable to William Watson and De Leon.[3] After receiving the division orders, Devon began paying the proceeds that it had been holding in suspense. Devon paid William Watson approximately $557,299.48 between March 3, 2013 and October 3, 2013.[4] Devon paid De Leon approximately $224,109.69 between March 3, 2013, and October 3, 2013.

In November 2013, De Leon assigned his interest in the Bray Interest to P&J Energy. Following this assignment, Devon and P&J Energy executed new division orders reflecting the assignment. Shortly after Devon and P&J Energy executed the new division order, William Watson passed away. William Watson's interest in the Bray Interest transferred to the Watson Group. Devon paid the Watson Group according to their division orders until October 15, 2016. In total, Devon paid the Watson Group and De Leon $1,093,347.27 for payments attributable to the Bray Interest.

On November 11, 2016, Perdido's attorney sent Devon a demand letter on behalf of Smitherman Jr. (hereinafter Smitherman) claiming that Smitherman owned

---

[3]William Watson's division order reflected that he was entitled to 66.67% of the Bray Interest and that De Leon was entitled to 33.33% of the interest.

[4]October 3, 2013 is four years prior to the date that suit was filed in this case.

50% of the Bray Interest. In the letter, Perdido asserted that Smitherman's father was married to Pauline Bray at the time of her death, and because of intestacy laws, his father was entitled to half of her interest. Perdido further claimed that after the deaths of Smitherman's father and his father's widow, he was entitled to half of the Bray Interest. On December 12, 2016, Devon and Smitherman entered into a Release Agreement pertaining to the unpaid royalties. Under the Release Agreement, Devon paid Smitherman $50,000.

On February 16, 2017, Perdido's attorney sent Devon a demand letter on behalf of Bremer Jr. (hereinafter Bremer) asserting that Bremer owned 25% of the Bray Interest. In the letter, Perdido claimed that Bremer was entitled to 25% of the Bray Interest because his mother, Clair Bremer, survived her sister, Pauline Bray. Perdido further claimed that Bremer inherited 25% of the Bray Interest through his parents' wills. Over the next several weeks, Devon and Perdido's counsel communicated via email concerning potential release agreements with respect to Bremer's claim for unpaid royalties. However, the parties did not enter into a release agreement. Ultimately, Devon did not pay Smitherman or Bremer any royalties (aside from the $50,000 that Smitherman received under the Release Agreement).

On behalf of Smitherman and Bremer, Perdido filed suit on October 3, 2017, against Devon and the Watson Group. Perdido asserted a cause of action against Devon based on the contention that Devon had failed to pay the royalties due Smitherman and Bremer under the terms of the oil and gas leases for the subject properties. Perdido also asserted a claim under the Natural Resources Code against Devon for the nonpayment of royalties, and a claim for breach of fiduciary duty. Perdido asserted an "alternative claim" against the Watson Group for unjust enrichment and money had and received based upon the contention that the Watson Group received payments from Devon that should have been made to Smitherman and Bremer.

5

Devon responded to Perdido's suit by asserting limitations as an affirmative defense. In this regard, Perdido filed suit more than four years after Devon began to distribute royalties that it had held in suspense. Devon also asserted that Smitherman's claims were released by virtue of the release agreement. The Watson Group also asserted limitations as an affirmative defense. Devon asserted a cross-claim against the Watson Group on the basis that Devon overpaid royalties to the Watson Group. Devon also asserted a cause of action for breach of contract against Perdido and Smitherman for breach of the release agreement.

The Watson Group sought and obtained a partial summary judgment on Perdido's claims based on limitations. Devon also sought and obtained a partial summary judgment based on limitations to Perdido's claims with respect to claims accruing before October 3, 2013. The trial court denied Perdido's competing motion for summary judgment wherein it sought judgment as a matter of law against Devon for nonpayment of royalties.

Devon subsequently filed a motion for summary judgment on the remainder of Perdido's claims. Devon sought a traditional summary judgment under *Gavenda v. Strata Energy, Inc.*[5] on the basis that Perdido's claims on behalf of Smitherman and Bremer were precluded because Devon paid the royalties attributable to their respective interests under a division order. Devon also asserted that all of Smitherman's and Bremer's claims were barred by limitations, and that Perdido had no evidence to support its claims for fraudulent inducement or conspiracy. Perdido also filed a second motion for summary judgment asserting that the holding in *Gavenda* did not apply to the facts in this case. The trial court granted Devon's subsequent motion for summary judgment and denied Perdido's subsequent motion for summary judgment in an order that disposed of the entire case.

---

[5]705 S.W.2d 690, 692–93 (Tex. 1986).

*Analysis*

On appeal, Perdido presents four issues in which it challenges the trial court's summary judgment in favor of Devon. As previously noted, Perdido and Devon filed competing motions for summary judgment. When parties file competing motions for summary judgment and the trial court grants one party's motion and denies the other's motion, we review the summary judgment evidence presented by both parties and determine all the issues presented. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

We review the trial court's grant of summary judgment de novo. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). When the trial court's order does not specify the grounds for its summary judgment, we will affirm the summary judgment if any of the theories are meritorious. *Knott*, 128 S.W.3d at 216. Generally, if a party moves for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

After an adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). We review a no-evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.* Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). To be entitled to a traditional summary judgment, a defendant must conclusively negate at least one essential element of the cause of action being asserted or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979).

I. *Appellant's Statutory Claim for Nonpayment of Royalties*

In its first issue, Perdido contends that the trial court erroneously granted Devon's summary judgment motion on Smitherman's and Bremer's claims under Section 91.402 of the Texas Natural Resources Code for nonpayment of royalties. *See* TEX. NAT. RES. CODE ANN. § 91.402 (West Supp. 2022). Perdido asserts that Devon violated Section 91.402 of the Natural Resources Code by paying the entire Bray Interest to De Leon and the Watson Group. In presenting this issue, Perdido seeks to overcome two legal defenses presented by Devon to Smitherman's and Bremer's statutory claim for unpaid royalties. As set out below, these legal defenses would entirely preclude Smitherman's and Bremer's claims for unpaid royalties irrespective of the timeliness of Perdido's suit. Furthermore, these legal defenses would apply equally to Smitherman's and Bremer's claims.

"A payee has a cause of action for nonpayment of oil or gas proceeds or interest on those proceeds as required in Section 91.402 . . . ." *Id.* § 91.404(c) (West

8

2011). In order to prevail on a cause of action for nonpayment of royalties, Perdido must show that (1) both Smitherman and Bremer are payees; (2) Devon is a payor; (3) Devon failed to pay the proceeds attributable to the Bray Interest to either Smitherman or Bremer; (4) Smitherman and Bremer gave written notice by mail of Devon's alleged failure to pay their royalties; (5) Devon did not pay the royalties within thirty days of receiving written notice; and (6) Smitherman and Bremer were injured as a result of nonpayment. *See Ellison v. Three Rivers Acquisition, LLC*, 609 S.W.3d 549, 567 (Tex. App.—Corpus Christi–Edinburg 2019), *rev'd on other grounds sub nom. Concho Res., Inc. v. Ellison*, 627 S.W.3d 226 (Tex. 2021).

The summary judgment evidence includes a judgment declaring heirship for Pauline Bray. In the judgment, the County Court at Law of Ector County declared the heirs of Pauline Bray to be Bremer at one-quarter interest, William Doane Watson at one-quarter interest, and Smitherman at one-half interest. This judgment declaring heirship establishes that both Smitherman and Bremer are entitled to a percentage of the proceeds attributable to the Bray Interest, and thus they are payees.

The summary judgment evidence also established that Devon was responsible for paying out the proceeds attributable to the Bray Interest and that Devon paid all the proceeds to De Leon and the Watson Group. The summary judgment evidence further established that both Smitherman and Bremer sent Devon demand letters and that Devon failed to pay within thirty days of receiving notice. Devon does not contest this summary judgment evidence; rather, Devon contends that its nonpayment was excused because of the agreed judgment in the suit involving Enerlex, and that *Gavenda* bars Appellant's suit against Devon for unpaid royalties.

A. *Enerlex Judgment*

Devon's first legal justification for the nonpayment of royalties to Smitherman and Bremer is the agreed judgment involving Enerlex. In September of 2009, William Watson was diagnosed with dementia. He subsequently executed a

mineral deed on November 13, 2009, conveying all of his mineral interest in Ector County to Enerlex. In 2011, Lawrence Watson, as William Watson's court-appointed conservator, sued both Enerlex and Devon. Watson's lawsuit sought to

> cancel, set aside and declare void a fraudulent and forged mineral deed purportedly executed by William Doane Watson in favor of Enerlex . . . at a time that William Doane Watson was legally incompetent, legally and mentally incapacitated, and legally incapable of having the requisite intent to . . . execute any conveyance to Enerlex . . . .

In October 2012, the 244th District Court of Ector County entered an agreed judgment executed by attorneys for Lawrence Watson, Enerlex, and Devon. The agreed judgment set aside William Watson's conveyance to Enerlex. The agreed judgment further provided that:

> All right, title and interest to the property in the purported conveyance [be] immediately restored *ab initio* and to be held by Lawrence B. Watson, as Court Appointed Conservator of William Doane Watson, an incapacitated Person. This Agreed Judgment instrument fully, finally and immediately adjudicates the ownership, right, title and interests described herein.

The Agreed Judgment further provided that Lawrence Watson would execute and deliver "properly drafted division orders" to Devon and that Devon would provide Lawrence Watson "all funds in their possession payable to the interest of William Doane Watson."

Devon contends that the agreed judgment determined that all of Pauline Bray's interest passed to William Watson. Devon further asserts that Appellant's claim for nonpayment of royalties is an impermissible collateral attack on the agreed judgment.

We first observe that the Enerlex litigation was a suit to set aside the conveyance from William Watson to Enerlex. It was not a proceeding to declare heirship with respect to Pauline Bray as contemplated by the Texas Estates Code.

10

*See* TEX. EST. CODE ANN. § 202.001 (West 2020). In this regard, the unknown heirs of Pauline Bray were not made parties to the litigation, and an attorney ad litem was not appointed by the trial court to represent the unknown heirs—both of which are statutory requirements of a proceeding to declare heirship. *See id.* §§ 202.008, .009. Furthermore, "[e]xclusive original jurisdiction to determine heirship is conferred upon the county court sitting in probate, and the district court has no such original jurisdiction." *Thomas v. Tollon*, 609 S.W.2d 859, 860 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *see Estate of Torrance v. State*, 812 S.W.2d 393, 396 (Tex. App.—El Paso 1991, no writ) (addressing the exclusive jurisdiction of the county courts of Ector County to determine heirship).

The Enerlex judgment does not provide that William Watson owned the entire Bray Interest. The judgment restored William Watson's ownership in the interest that he conveyed to Enerlex, but it did not address what he received from Pauline Bray. As we noted above, Enerlex had previously advised Devon that it had acquired one-quarter of Pauline Bray's interest by virtue of its deed from William Watson. Furthermore, the Enerlex judgment was an agreed judgment. Agreed judgments are construed in the same manner that contracts are. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 422 (Tex. 2000). An agreed judgment is "contractual in nature and in effect is a written agreement between the parties as well as an adjudication." *Avila v. St. Luke's Lutheran Hosp.*, 948 S.W.2d 841, 854 (Tex. App.—San Antonio 1997, pet. denied) (citing *Wagner v. Warnasch*, 295 S.W.2d 890, 893 (Tex. 1956)). However, agreed judgments are "binding only as to the parties to the agreement and not as to any other party . . . unless the other parties are bound by the doctrine of virtual representation." *Id.* at 854 (citing *Lowe v. Ragland*, 297 S.W.2d 668, 673 (Tex. 1957); *Sawyer v. Smith*, 552 S.W.2d 936, 940 (Tex. App.—Waco 1977, writ ref'd n.r.e.)). "A person who is not a party or privy to a party to an action in which a valid judgment . . . is rendered is not bound by . . . an adjudication upon any matter

11

decided in the action." *Id.* at 854–55 (citing *Blonder-Tongue Lab. Inc. v. Univ. of Ill. Found.*, 402 U.S 313, 322 (1971)). "[O]ne not before the court cannot be bound by any judgment entered." *Id.* at 855.

Neither Smitherman nor Bremer were parties to the Enerlex lawsuit or the agreed judgment that resulted from it. Furthermore, there is no contention that either of them were in privity with any of the parties to the agreed judgment or that Smitherman and Bremer were bound to the agreed judgment by the doctrine of virtual representation. Therefore, neither Smitherman nor Bremer are bound by the agreed judgment as Devon contends, and it does not preclude Appellant's claim for nonpayment of royalties.

### B. *Applicability of Gavenda*

Devon next contends that Smitherman and Bremer cannot pursue a claim for nonpayment of royalties against Devon under *Gavenda* because Devon made payments according to division orders. Signed division orders create a contractual relationship. *See Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 770 (Tex. 1994). "[Division orders] are binding between the parties 'for the time and to the extent that they have been or are being acted on and made the basis of settlements and payments, and from the time that notice is given that settlements will not be made on the basis provided in them, they cease to be binding.'" *Cabot Corp. v. Brown*, 754 S.W.2d 104, 107–08 (Tex. 1987) (quoting *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 250–51 (Tex. 1981)).

Division orders are "the mechanism for payment to a payee of its share of oil and gas proceeds." *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 560 (Tex. App.—San Antonio 2011, no pet.), *abrogated on other grounds by Nath v. Tex. Children's Hosp.*, 576 S.W.3d 707 (Tex. 2019). The Natural Resources Code permits a payor to require a signed division order "[a]s a condition for the payment of proceeds from the sale of oil and gas production." NAT. RES. § 91.402 (c)(1).

12

"[T]he statute places the burden on the payor to submit a division order to the payee for its signature; it is not the royalty owner or mineral interest owner's burden to draft its own division order, sign it, and submit it to the payor." *Prize Energy Res., L.P.*, 345 S.W.3d at 560 (citing NAT. RES. § 91.402 (c)(1)); *see Circle Ridge Prod., Inc. v. Kittrell Fam. Mins., LLC*, No. 06-13-00009-CV, 2013 WL 3781367, at *6 (Tex. App.—Texarkana July 17, 2013, pet. denied) (mem. op.); *Jones v. Clem*, No. 11-10-00123-CV, 2012 WL 1069168, at *4 (Tex. App.—Eastland Mar. 29, 2012, no pet.) (per curiam) (mem. op.) ("[I]n order to rely upon a division order, [the payor] had the obligation to submit it to the payees for signature.").

The Texas Supreme Court described the issue before the court in *Gavenda* as follows: "This oil and gas case concerns the effect of division and transfer orders. The issue is whether division and transfer orders are binding until revoked when an operator who prepares erroneous orders underpays royalty owners, retaining part of the proceeds for itself." 705 S.W.2d at 690. The Gavenda family conveyed a tract of land to the Feinsteins, reserving a fifteen-year, one-half nonparticipating royalty interest. *Id.* The Feinsteins subsequently conveyed the property, subject to the Gavendas' reservation, to Blaha. *Id.* at 691. Blaha then executed an oil and gas lease providing for a one-eighth royalty. *Id.* Strata Energy erroneously prepared division orders that provided that the Gavendas reserved a one-sixteenth nonparticipating royalty interest rather than a one-half nonparticipating royalty interest. *Id.* The Gavendas signed the erroneous division orders submitted to them by Strata Energy. *Id.* As a result of the erroneous division orders, Strata Energy underpaid the Gavendas' royalty by seven-sixteenths, which amounted to $2.4 million. *Id.*

The Gavendas filed suit against Strata Energy to recover the underpaid royalties. *Id.* Strata Energy asserted, and the trial court and court of appeals agreed,

13

that the division orders executed by the Gavendas were binding until revoked, thereby precluding a recovery for the Gavendas. *Id.*

In its analysis, the Texas Supreme Court noted the general rule that division orders are binding until revoked and that they bind underpaid royalty owners. *Id.* (citing *Middleton*, 613 S.W.2d at 250; *Chicago Corp. v. Wall*, 293 S.W.2d 844, 847 (Tex. 1956)). The court further noted that one of the principles underlying this rule is detrimental reliance. *Id.* at 691–92. As explained by the court:

> In the typical case, purchasers and operators following division orders pay out the correct total of proceeds owed, but err in the distribution, overpaying some royalty owners and underpaying others. If underpaid royalty owners' suits against purchasers and operators were not estopped, purchasers and operators would pay the amount of the overpayment twice—once to the overpaid royalty owner under the division order and again to the underpaid royalty owner through his suit. They would have double liability for the amount of the overpayment. Exposing purchasers and operators to double liability is unfair, because they have relied upon the division order's representations and have not personally benefited from the errors.

*Id.* at 692 (citation omitted). The court further noted that generally, the underpaid royalty owners have a remedy to recover from the overpaid royalty owners under the theory of unjust enrichment. *Id.* (citing *Allen v. Creighton*, 131 S.W.2d 47, 50 (Tex. App.—Beaumont 1939, writ ref'd)).

The court in *Gavenda* recognized that when the operator prepares erroneous division orders and retains the benefits, Texas courts have held that the division orders were not binding. *Id.* (citing *Stanolind Oil & Gas Co. v. Terrell*, 183 S.W.2d 743 (Tex. App.—Galveston 1944, writ ref'd)). Based upon this principle, the court determined that the Gavendas were not bound by the division orders that they executed because Strata Energy prepared the division order, distributed the royalties, and retained the seven-sixteenths royalty that should have been distributed to the Gavendas. *Id.* at 692–93. Thus, Strata Energy profited at the Gavendas' expense.

*Id.* at 693. The court determined that Strata Energy was liable to the Gavendas "for whatever portion of their royalties it retained, although it is not liable to the Gavendas for any of their royalties it paid out to various overriding or other royalty owners." *Id.*

Because Devon paid out all of the royalty proceeds attributable to the Bray Interest pursuant to division orders, it contends that under *Gavenda*, it is not liable to Smitherman and Bremer as unpaid payees. In this regard, Devon contends that it was not unjustly enriched. Conversely, Perdido asserts that *Gavenda* does not control the outcome in this case because Smitherman and Bremer did not sign the division orders. Perdido contends that there is no justification for imposing a rule that binds non-signatory royalty owners to erroneous division orders signed by another party.

Devon's reliance on *Gavenda* is understandable because unlike Strata Energy, Devon was not unjustly enriched—it paid out the total amount of royalty due for the Bray Interest, albeit to the wrong parties. However, the holding in *Gavenda* does not squarely align with the facts in this appeal. The parties have not cited any post-*Gavenda* authority from Texas for the situation here involving a non-signatory to division orders suing an operator that paid out royalties to the wrong royalty owner.

The Texas Supreme Court has addressed *Gavenda* on a few occasions since its issuance. In *Heritage Resources v. NationsBank*, the court cited *Gavenda* for the proposition that "[w]hen an operator prepares a division order that allocates payments among the interest owners in a manner that differs from the lease provisions and the operator retains the benefits, the division order is not binding. 939 S.W.2d 118, 123 (Tex. 1996) (citing *Gavenda*, 705 S.W.2d at 692). The court noted that the basis for the ruling in *Gavenda* was unjust enrichment. *Id.*

The court revisited *Gavenda* in *HECI Exploration Co. v. Neel*, where it cited *Gavenda* for the proposition that a royalty owner has a cause action against the lessee based on unjust enrichment when the lessee profited at the royalty owner's expense. 982 S.W.2d 881, 891 (Tex. 1998) (citing *Gavenda*, 705 S.W.2d at 693). As noted by the court in *Neel*, "[u]njust enrichment was the basis for recovery in *Gavenda*." *Id.* The court stated that it held in *Gavenda* that "division orders were not binding on a royalty owner when the lessee erroneously prepared them and then retained for itself the royalty that should have been paid." *Id.*

These cases reflect that under *Gavenda*, division orders are not binding to preclude a claim against the lessee when the lessee retains a benefit from the erroneous division orders and is therefore unjustly enriched. Thus, the holding in *Gavenda* reflects an exception to the general rule that division orders are binding until revoked.

Devon relies on *Gavenda* for a different proposition—that if the lessee has paid out all out of the royalties due for a particular interest under division orders executed by other royalty owners, the unpaid royalty owner has no claim against the lessee because the lessee has not been unjustly enriched. Instead, Devon contends that the unpaid royalty owner's sole remedy is to pursue a claim for unjust enrichment against the overpaid royalty owners.

The North Dakota Supreme Court addressed a fact scenario similar to the circumstances in this case in *Acoma Oil Corp. v. Wilson*. 471 N.W.2d 476 (N.D. 1991). *Acoma* involved a dispute over the payment of a 6.5% royalty interest. *Id.* at 478. Acoma and the Bassett Trust asserted that they were entitled to recover from the operator, Universal, for underpaid royalties that had been incorrectly deducted from their royalty payments for the 6.5% royalty interest. *Id.* at 478, 484. The 6.5% royalty interest should have been deducted wholly from Wilson's interest. *Id.* at 484. Thus, Wilson had been overpaid by Universal. *Id.* Universal responded that

16

it was not liable to Acoma and the Bassett Trust because it relied on division orders executed by Wilson and Acoma, and that it had paid 100% of the proceeds owed and therefore was not unjustly enriched. *Id.*

The North Dakota Supreme Court noted the different status of Acoma and the Bassett Trust—Acoma had signed a division order, but the Bassett Trust had not. *Id.* The court quoted extensively from *Gavenda* in its analysis. *Id.* at 484–85. Citing *Gavenda*, the court held that Acoma was not entitled to recover underpayments from Universal during a period when Universal paid Acoma pursuant to executed division orders. *Id.* at 485. But with respect to the Bassett Trust, the court held that because the Bassett Trust had not executed division orders, Universal could not rely on the division orders executed by the other parties to absolve it from underpaying the Bassett Trust. *Id.* at 486. Thus, the Bassett Trust could recover underpaid royalties from Universal—it was not limited to pursing a claim for unjust enrichment from Wilson, the overpaid royalty owner. *Id.*

The North Dakota Supreme Court revisited the *Acoma* holding in *Maragos v. Newfield Production Co.* 900 N.W.2d 44, 47 (N.D. 2017). In *Maragos*, the court described the holding in *Acoma* as follows:

> In *Acoma*, two underpaid parties with royalty interests in a tract of land sought payments of the underpaid royalties from the oil company. The oil company argued it was not liable for the underpayment because it had "paid out 100% of the proceeds" and "received no benefit and has not been unjustly enriched." We disagreed, but differentiated between the two parties based upon whether the party had entered into a division and transfer order with the oil company. We held that the party who executed a division order with the oil company should not be able to recover from the oil company because the oil company had detrimentally relied upon the order and it would subject them to double liability. As to the party who had not executed a division order, we found the oil company's reliance on the title opinion could not absolve it of all liability as to the underpayments and that party could recover the underpayments from the oil company.

17

*Id.* (citations omitted). The North Dakota Supreme Court held that the lower court misapplied *Acoma*. The court held that "in situations where a signed division order is not present, the underpaid party can seek payments from the oil company." *Id.*

The North Dakota Supreme Court once again revisited *Acoma* and *Gavenda* in *Continental Resources, Inc. v. Armstrong*. 965 N.W.2d 57, 66–67 (N.D. 2021). The court noted that:

> Our rule is that when an operator has relied to its detriment on a division order signed by an underpaid royalty owner, the underpaid owner is estopped from recovering the underpayments from the operator and must seek recovery from the overpaid royalty owners. "The basis for the recovery is unjust enrichment; the overpaid royalty owner is not entitled to the royalties."

*Id.* at 67 (citation omitted) (quoting *Acoma*, 471 N.W.2d at 486). The court then noted that in *Maragos*, it had held that:

> [W]hen an operator has not "detrimentally relied" on a division order, there is no basis for estopping an underpaid party's attempt to recover from the operator. Thus, when the underpayments are not made according to a signed division order, the underpaid party "can seek payments from the oil company."

*Id.* (citations omitted) (quoting *Maragos*, 900 N.W.2d at 47).

In *Acoma*, *Maragos*, and *Armstrong*, the North Dakota Supreme Court analyzed the holding in *Gavenda* and applied it to facts that are present in this case— royalty interest owners who are not signatories to division orders bringing suit against the operator for unpaid royalties. The court determined that even though the operator had paid out all of the revenue attributable to the royalty interest under division orders, a nonpaid or underpaid non-signatory could bring suit against the operator for unpaid royalties. It was of no consequence that the operator may have been exposed to double liability in this situation because it had not relied to its

detriment on any actions taken by the non-signatory. *See Armstrong*, 965 N.W.2d at 67; *Maragos*, 900 N.W.2d at 47; *Acoma*, 471 N.W.2d at 485–86.

As noted previously, Smitherman and Bremer are not subject to the Enerlex judgment because they were not parties to it. Similarly, they were also not parties to the division orders upon which Devon paid royalties to De Leon and the Watson Group. The opinions from North Dakota with respect to the effect of *Gavenda* on the situation before us are both instructive and persuasive. For the same reasons expressed by the North Dakota Supreme Court, we conclude that the holding in *Gavenda* does not preclude Smitherman's and Bremer's suit against Devon for unpaid royalties. *See Armstrong*, 965 N.W.2d at 67; *Maragos*, 900 N.W.2d at 47; *Acoma*, 471 N.W.2d at 485–86. Even though Devon was not unjustly enriched, it could not have detrimentally relied on the actions of Smitherman and Bremer because they did not sign the division orders. Accordingly, *Gavenda* does not preclude Smitherman and Bremer from bringing suit against Devon for unpaid royalties. We sustain Perdido's first issue. However, this issue is not dispositive of this appeal because we must address Devon's other grounds for summary judgment.

II. *Appellant's Claim for Breach of Contract*

In Perdido's second issue, it asserts that the trial court erroneously granted Devon's motion for summary judgment on Smitherman's and Bremer's claims for breach of contract. Perdido contends that Devon breached the "oil and gas leases by failing to pay royalties." This contention pertains to both Smitherman's claim and Bremer's claim. Perdido additionally asserts that, with respect to Smitherman's claim, Devon breached a release agreement by failing to pay the remainder of Smitherman's portion of the Bray Interest.

A. *Claim for Breach of Lease—"Change in Ownership" Clause*

Appellant's claim for breach of the 2006 oil and gas lease concerns the same unpaid royalties as their statutory claim for unpaid royalties covered in the previous

19

section.  In many respects, the claim for breach of the lease mirrors the statutory claim.  However, there is a provision in the lease that Devon contends precludes Smitherman's and Bremer's claims for breach of the lease.

The section of the lease upon which Devon relies provides as follows:

> The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to their heirs, successors[,] and assigns; but no change or division in ownership of the land, shut-in royalties or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U.S. Mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same.

Devon contends that this provision absolves it from liability to Smitherman and Bremer under the lease because it had paid all royalties due them to the Watson Group prior to Perdido notifying Devon of Smitherman's and Bremer's claim.

We addressed a similar lease provision in *Jones v. Clem*.  2012 WL 1069168, at *3.  We referred to it as a "change in ownership" clause, and we noted that it "relieve[s] a lessee from liability for the mispayment of royalty or delay rentals, when the mispayment is caused by a change in ownership and no notice is given to the lessee of such change" and that such clauses "have been upheld and enforced." *Id.* (citing *Cassity v. Smith*, 193 S.W.2d 991 (Tex. App.—Texarkana 1946, writ ref'd)).

Here, the mispayment of the royalties due Smitherman and Bremer to the Watson Group did not occur as a result of a change in ownership from the Watson Group to Smitherman and Bremer—the Watson Group was never entitled to receive the royalties due Smitherman and Bremer.  Furthermore, Smitherman and Bremer did not receive their interests as a result of an assignment from the Watson Group.

20

Accordingly, this portion of the change in ownership clause does not preclude Smitherman's and Bremer's claim to royalties under the lease.

### B. *Release Agreement*

On behalf of Smitherman, Perdido asserts that the trial court erred in granting Devon's motion for summary judgment on Smitherman's claim for breach of contract pertaining to a "release agreement" that he executed with Devon.[6] In general terms, the release agreement provided for a payment of $50,000 from Devon to Smitherman. However, the parties disagree on the effect of the agreement.

Devon contends that the $50,000 payment satisfied its entire obligation for royalties on past production owed to Smitherman and barred him from bringing any claims for past due royalties. Thus, Devon contends that the release agreement only operates to reserve Smitherman's right to royalties for future production because Smitherman released all his claims for royalties for past production.

Perdido asserts that the release agreement did not release Smitherman's claims for royalties for past production. Perdido interprets the $50,000 payment as merely a credit toward the entire amount of royalties for past production owed to Smitherman.

As with any contract, our task is to "ascertain the true intentions of the parties as expressed in the writing itself." *Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). This analysis begins with the contract's express language. *Id.* We construe the instruments as a whole, giving the language its plain, ordinary, and generally accepted meaning unless the context indicates that the parties used terms in a technical or different sense. *Id.* To the

---

[6]El Dorado Resources, LLC, is also a party to the release agreement. Because El Dorado is not a party to this appeal, we do not address the release agreement with respect to El Dorado.

extent possible, we strive to harmonize and give effect to all the contract provisions so that none will be rendered meaningless. *Id.*

Neither party contends that the language of the release agreement is ambiguous, nor do we find it to be ambiguous. When a contract can be given a definite and certain meaning, it is not ambiguous even though the parties advance competing constructions. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764–65 (Tex. 2018). Unambiguous contracts must be enforced as written without considering extrinsic evidence bearing on the parties' subjective intent. *Id.* In keeping with our commitment to freedom of contract, we will not rewrite it to add to or subtract from its language or to interpolate constraints not found in the unambiguous language. *Id.*

The release agreement begins with several recitals. The release agreement contains the following provision concerning its recitals: "6. The Parties acknowledge and agree that the clauses in the preceding 'Recitals' section are true and correct, and are incorporated herein as material parts to this Release." The recitals provide that Smitherman claimed an ownership interest in the subject wells and that he had not been paid royalties for his claimed ownership interest. The recitals further provide that Smitherman had demanded payment and an accounting, and that Devon was investigating his demand. The recitals also provided that "Smitherman is in the process of obtaining judicial confirmation of his ownership in the Disputed Interest." The recitals concluded with the following provision:

> **WHEREAS**, pending resolution of the foregoing title issues and receipt of the Order, Devon has agreed as an accommodation to Smitherman to tender to Smitherman a payment relating to the Demand as detailed herein in exchange for a release and further subject to the terms and conditions of set forth herein.

The next section of the release agreement was under the heading of "Agreement." The first paragraph of this section provides as follows:

> 1. Upon receipt of this Release fully executed by all Parties, Devon will pay Smitherman a payment of fifty thousand dollars ($50,000) (the "**Payment**"). The payment will be tendered as a check made payable to "Leon C. Smitherman, Jr." in his individual capacity only. The Payment will be applied as a credit towards any amounts due and owing Smitherman from Devon, if any, for any ownership he is determined to have in the Disputed Interest pursuant to the Order, within any applicable statutes of limitations, assuming that an applicable statute of limitations applies to the Disputed Interest. Devon reserves the right to make any adjustments to or ask for return of the Payment (either directly or through an appropriate judicial proceeding) in the event that Smitherman is determined not to own the Disputed Interest to which the Payment relates.

The next section of the release agreement is entitled "Release," and it consists of three parts. Subsection 2.A. provides that in exchange for the payment of the $50,000 to Smitherman, he and those claiming through him "hereby fully and forever release, discharge, acquit, settle, and hold Devon . . . harmless from any and all Claims." Subsection 2.B. defines "Claim" and "Claims," by providing a very broad definition of the two terms. Subsection 2.C. then limits that definition: "In this Release, 'Claim' and 'Claims' does not include, and Smitherman is not releasing, the right to payment of any principal royalty due on production from the portion of the Disputed Interest that Smitherman is determined to own pursuant to the Order." Subsection 2.C. further provides that "the release granted herein is conditional upon Devon . . . making payment to Smitherman of all remaining sums due and owing to Smitherman (less the Payment) by virtue of the Order (such sum being the "Balance Due") within thirty (30) days following delivery of the Order to Devon."

23

Under the terms of the release agreement, Devon's payment of $50,000 to Smitherman did not satisfy its obligation to him for royalties for past production. We first note that the release agreement makes no distinction between past production and future production and no reference to either past or future production. Contrary to Devon's position, the "carve-out" provision of Subsection 2.C. is not limited to royalties for future production because the provision does not reference future production. *URI, Inc.*, 543 S.W.3d at 769–70 (Courts do not rewrite contracts to add terms not originally supplied by the parties.). In the absence of an express limitation in Subsection 2.C. to future production, its reference to "royalty due on production" includes both past and future production. Thus, under Subsection 2.C., Smitherman did not release his right to payment for royalties due on any production, including past production.

Other portions of the release agreement indicate that Smitherman did not release his claim for royalties for past production based on the payment of $50,000. The "agreement" provision quoted above specifies that the $50,000 payment "will be applied as a credit towards any amounts due and owing Smitherman." This provision, along with a recital, contemplates that a determination of Smitherman's claim for royalties was in the process of being made. The agreement paragraph further specifies that Devon retained the right to seek a return of the $50,000 payment from Smitherman in the event it was later determined that Smitherman did not own the disputed interest and was therefore not entitled to any royalties. This right of Devon to seek reimbursement indicates that the $50,000 payment was not a final settlement of Smitherman's claim for royalties for past production.

Devon poses the following question in its brief: "what claims were being released under the Release Agreement if not royalties for past production?" The answer to this question is not easy to articulate. With respect to the purpose of the $50,000 payment, a recital in the release agreement specifies the purpose of the

24

payment—"an accommodation to Smitherman" in the form of an advance as partial payment for the sums, if any, that Devon might later be determined to owe him for royalties. The release agreement contemplates future events in two respects: (1) a determination of Smitherman's entitlement to royalties and (2) a future payment by Devon of the remaining amount of royalties that Smitherman was entitled to receive. Upon the occurrence of those two events, Smitherman's claim for royalties would be released under the terms of the release agreement. Additionally, the release agreement also releases extra-contractual claims that Smitherman might possesses against Devon.

In summary, the release agreement did not release Smitherman's claim for royalties for past production. To the extent that the trial court determined that it did, it erred.

Because neither the terms of the oil and gas lease nor the terms of the release agreement preclude Smitherman's and Bremer's claims for unpaid royalties, we sustain Perdido's second issue.

III. *Limitations*

Perdido's third issue concerns Devon's affirmative defense of limitations. Perdido asserts that the trial court erred in calculating the date of accrual for the applicable limitations period. Perdido also asserts that it raised a fact question on its equitable defense to Devon's claim of limitations. Additionally, Perdido contends that Devon acknowledged its indebtedness to Bremer and that as a result, Bremer's claim is not subject to Devon's limitation defense.

Perdido filed the underlying suit on behalf of Smitherman and Bremer on October 3, 2017. Devon filed a motion for partial summary judgment asserting that all claims for the nonpayment of royalties that accrued prior to October 3, 2013, were barred based on the applicable four-year statute of limitations. The trial court granted Devon's motion for partial summary judgment by determining that

25

Smitherman's and Bremer's claims for the nonpayment of royalties accruing prior to October 3, 2013, were barred by limitations.[7]

"A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense." *Draughon v. Johnson*, 631 S.W.3d 81, 88 (Tex. 2021) (quoting *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 593 (Tex. 2017)). "[T]he defendant has the burden regarding any issues raised that affect which days count toward the running of limitations—such as accrual, the discovery rule, and tolling." *Id.* "[I]f the defendant carries that burden and conclusively establishes its defense, the plaintiff can avoid summary judgment by raising a genuine issue of material fact on any equitable defense that its suit should not be barred even though the limitations period has run—such as fraudulent concealment, estoppel, or diligent service." *Id.* at 89.

### A. *Accrual of Limitations*

The parties agree that the statute of limitations for unpaid royalties, whether couched as a claim under the applicable statutes or a claim for breach of contract, is four years. *See Lyle v. Jane Guinn Revocable Tr.*, 365 S.W.3d 341, 354–55 (Tex. App.—Houston [1st Dist.] 2010, pet denied); *Headington Oil Co., L.P. v. White*, 287 S.W.3d 204, 214 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Koch Oil Co. v. Wilber*, 895 S.W.2d 854, 864 (Tex. App.— Beaumont 1995, writ denied); *Harrison v. Bass Enters. Prod. Co.*, 888 S.W.2d 532, 537 (Tex. App.—Corpus Christi 1994, no writ); *Dvorken v. Lone Star Indus. Inc.*, 740 S.W.2d 565, 566 (Tex. App.—Fort Worth 1987, no writ). However, the parties disagree on when Smitherman's and Bremer's claims for unpaid royalties accrued. The question of accrual is important for multiple reasons. As noted previously, the date of accrual

---

[7]The trial court incorporated the partial summary judgment into its final judgment granting Devon's motion for summary judgment as to the entire case.

is an element of Devon's limitations defense. Additionally, the date of accrual is relevant to Perdido's equitable defenses to Devon's limitations defense.

Production from the subject lands began in 2008. Perdido asserts that the claims for nonpayment of royalties for production dating back to 2008 did not accrue until March 6, 2013, because until that date, Devon held in suspense all sums that should have been paid to Smitherman and Bremer. Thus, Perdido asserts that the applicable limitations period did not expire on production occurring prior to March 6, 2013, until March 6, 2017.[8] Conversely, Devon contends that the claim for nonpayment of royalties accrued on a recurring, monthly basis.

"As a general matter, 'a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy.'" *Archer v. Tregellas*, 566 S.W.3d 281, 288 (Tex. 2018) (quoting *Knott*, 128 S.W.3d at 221). This means that "a cause of action accrues 'when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred.'" *Id.* (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)). Ordinarily, the cause of action in a breach of contract case accrues when the breach occurs. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990).

In *Lyle v. Jane Guinn Revocable Trust*, the First Court of Appeals determined that royalty payments under a lease are periodic payments due during the course of the contract and that a cause of action for such payments arises at the end of each payment period. 365 S.W.3d at 355 (citing *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.— Houston [1st Dist.] 1984, writ ref'd n.r.e.)). Thus, because the lease at issue in *Lyle* contemplated a monthly accounting and payment of royalties, limitations for the nonpayment of royalties accrued on a monthly basis,

---

[8]As set out below, Perdido asserts that Smitherman and Bremer had grounds for extending the period for filing suit from March 6, 2017, until the date suit was filed (October 3, 2017).

27

and limitations barred the recovery of royalty payments due more than four years prior to the filing of suit. *Id.* The Corpus Christi–Edinburg Court of Appeals reached the same result in *Harrison v. Bass Enterprises Production Co.*, holding that a claim for unpaid royalties accrued on a monthly basis "as oil and gas are produced and the agreed royalty is not paid" based on the lease at issue. 888 S.W.2d at 537.

Here, the lease contemplates the payment of royalties on a monthly basis. The pay records indicate that Devon paid royalties on a monthly basis. Additionally, the applicable statute contemplates the payment of royalties based on the terms of the lease. NAT. RES. § 91.402(a); *see Leavitt v. Ballard Expl. Co.*, 540 S.W.3d 164, 171 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Thus, under *Lyle* and *Harrison*, limitations accrued on Smitherman's and Bremer's claims for the nonpayment of royalties on a monthly basis beginning in 2008.

Perdido seeks an exception to the preceding legal authority that dictates a monthly accrual for the nonpayment of royalties by asserting that Devon's act of holding the funds attributable to the Bray Interest in suspense until March 6, 2013, changed the date of accrual. However, Perdido does not cite any authority for this proposition, and we have found none. The Fourteenth Court of Appeals considered a similar contention in *Headington Oil Co. v. White.* 287 S.W.3d at 213–14. There, the plaintiffs asserted that the period of limitations was tolled under a constructive trust theory because the operator, Gary, held unpaid royalties in suspense. *Id.* The court rejected the contention of a constructive trust and held that limitations applied to prohibit a claim for the nonpayment of royalties accruing more than four years prior to filing suit against Gary. *Id.* at 214.

The same rationale applies to this case. Smitherman and Bremer were entitled to royalties on a monthly basis beginning in 2008 when production started on the subject properties. The fact that Devon held their royalties in suspense did not alter their ability to bring suit against Devon for the nonpayment of royalties.

28

Accordingly, Perdido is incorrect in its contention that Smitherman's and Bremer's claims for nonpayment of royalties for prior production did not accrue until March 6, 2013. Instead, Smitherman's and Bremer's claims for the nonpayment of royalties accrued on a monthly basis beginning in 2008. Thus, Devon carried its burden to conclusively establish the date of accrual. *See Draughon*, 631 S.W.3d at 88–89.

### B. *Claims for production occurring after October 2013*

Because Smitherman's and Bremer's claims for nonpayment of royalties accrued on a monthly basis, and because Perdido filed suit on their behalf in October 2017, their claims for royalties for production occurring after October 2013 were not barred by limitations.

### C. *Estoppel to claim limitations for production occurring prior to October 2013*

Perdido asserts that Devon is estopped from asserting limitations. It contends that Devon induced Perdido, Smitherman, and Bremer to delay filing suit until after limitations expired. "[A] plaintiff may invoke equitable estoppel as an affirmative defense in avoidance of a defendant's limitations defense." *Rincones*, 520 S.W.3d at 593. Thus, Perdido had the burden to raise a fact issue on each element of its affirmative defense in avoidance of limitations. *See Draughon*, 631 S.W.3d at 88–89; *Rincones*, 520 S.W.3d at 593.

The elements of Perdido's estoppel defense are: (1) Devon made a false representation or concealed material facts; (2) with actual or constructive knowledge of those facts; (3) with the intent that Smitherman, Bremer, and Perdido would act on Devon's representation; (4) to Smitherman, Bremer, and Perdido, who had no means of knowledge of the facts; and (5) Smitherman, Bremer, and Perdido detrimentally relied on the representations. *See Rincones*, 520 S.W.3d at 593–94 (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998)). Perdido generally contends that Devon made

misrepresentations to it, Smitherman, and Bremer that Devon was going to pay Smitherman's and Bremer's claims for unpaid royalties and that Devon did so to cause Perdido, Smitherman, and Bremer to delay filing suit until after limitations had expired.

1. *Claims for which limitations had already expired prior to Perdido contacting Devon*

Even if we accept Perdido's contention of a misrepresentation as correct, it must still show detrimental reliance that caused it to delay timely filing suit. *See id.* Perdido did not contact Devon on behalf of Smitherman until November 11, 2016, and Perdido did not contact Devon on behalf of Bremer until February 16, 2017. Thus, Devon's alleged misrepresentations did not occur before these dates. With respect to Smitherman, the applicable limitations period had expired for production occurring prior to November 2012 when Perdido contacted Devon on behalf of Smitherman. With respect to Bremer, the applicable limitations period had expired for production occurring prior to February 2013 when Perdido contacted Devon on behalf of Bremer.

The Corpus Christi–Edinburg Court of Appeals dealt with an analogous situation in *Conway v. Durell.* No. 13-10-00614-CV, 2012 WL 3043100, at *6 (Tex. App.—Corpus Christi–Edinburg July 26, 2012, no pet.) (mem. op.). It held that a plaintiff cannot show harm or prejudice, and thus cannot establish estoppel, for claims for which the applicable limitations had already expired at the time of the alleged misrepresentation. *Id.* We conclude that this interpretation is correct. Accordingly, Perdido has not raised a fact issue on its estoppel claim for Smitherman's claim for royalties occurring from production prior to November 2012 and for Bremer's claim for royalties occurring prior to February 2013. *See id.*

## 2. *Claims that could have been subject to estoppel*

Our next focus with respect to Perdido's estoppel claim is on the period of time for production between November 2012 (for Smitherman) / February 2013 (for Bremer) and October 2013 (four years prior to Perdido filing suit).[9] Because Perdido treats Smitherman's and Bremer's claim separately, we consider them separately as well.

### a. *Smitherman's claims for royalties from production from November 2012 until October 2013*

With respect to Smitherman's claim, Perdido contends that Devon is estopped to assert limitations because of the December 2016 release agreement. Perdido's contention in this regard is premised on its assertion that limitations did not accrue for unpaid royalties until March 6, 2013 (the date that Devon paid all royalties held in suspense to the Watson Group). However, we have rejected Perdido's contention of a delayed accrual. As noted previously, limitations for the nonpayment of royalties accrued on a month-to-month basis.

The release agreement did not estopp Devon from asserting limitations. The "Agreement" portion of the release agreement references that the $50,000 accommodation payment was being made for Devon's ultimate liability to Smitherman "within the applicable statutes of limitations." A later portion of the release agreement provides that Devon "hereby expressly reserve[s] and preserve[s], and do[es] not waive, any and all claims and defenses available to [it]." Accordingly, Devon was not estopped by the release agreement to assert limitations for Smitherman's claim for unpaid royalties.

---

[9]As noted previously, October 3, 2013, is the date used by the trial court in granting Devon's motion for partial summary judgment.

*b. Bremer's claim for royalties on production from February 2013 until October 2013*

As set out below, we conclude that Devon acknowledged its indebtedness to Bremer. Accordingly, we do not address Perdido's estoppel defense as it pertains to Bremer's claim.

*c. Devon's acknowledgment of its debt to Bremer for unpaid royalties*

On behalf of Bremer, Perdido asserts an additional ground as an alternative to Devon's limitations claim—that Devon acknowledged its indebtedness to Bremer. "Although a debt is barred by limitations, limitations can be avoided if the party to be charged acknowledges the debt in writing." *In re Estate of Curtis*, 465 S.W.3d 357, 367 (Tex. App.—Texarkana 2015, pet. dism'd). Section 16.065 of the Texas Civil Practice and Remedies Code provides as follows:

> An acknowledgment of the justness of a claim that appears to be barred by limitations is not admissible in evidence to defeat the law of limitations if made after the time that the claim is due unless the acknowledgment is in writing and is signed by the party to be charged.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.065 (West 2015). An acknowledgement of a debt under the statute creates a new obligation. *Stine v. Stewart*, 80 S.W.3d 586, 591 (Tex. 2002). "A suit on a debt is separate from a suit on a later written acknowledgment of the debt, and the latter is not barred by limitations merely because the former is." *DeRoeck v. DHM Ventures, LLC*, 556 S.W.3d 831, 834 (Tex. 2018). The acknowledgment of a debt can come before or after suit on the original debt is barred by limitations. *Id.* (citing *Cain v. Bonner*, 194 S.W. 1098, 1098 (Tex. 1917)).

To prevail on a claim for acknowledgment of a debt, the party asserting it must show that the acknowledgment was: "(1) . . . in writing and signed by the party to be charged; (2) contain an unequivocal acknowledgment of the justness or the

32

existence of the particular obligation; and (3) refer to the obligation and express a willingness to honor that obligation." *Id.* (citing *Stine*, 80 S.W.3d at 591). As noted by the San Antonio Court of Appeals:

> [I]n order for a written instrument to be sufficient to take a debt otherwise barred out of the operation of the statute of limitations, it must acknowledge the justness of the debt and express a willingness to pay. Where the debt is clearly acknowledged, however, the promise to pay is implied.

*Bright & Co. v. Holbein Fam. Min. Tr.*, 995 S.W.2d 742, 745 (Tex. App.—San Antonio 1999, pet. denied). "[T]he amount of the obligation the acknowledgment describes must be 'susceptible of ready ascertainment.'" *Stine*, 80 S.W.3d at 591–92 (quoting *Stefek v. Helvey*, 601 S.W.2d 168, 171 (Tex. App.—Corpus Christi 1980, writ ref'd n.r.e.)). Whether a written instrument sufficiently acknowledges a barred debt is a question of law. *Bright & Co.*, 995 S.W.2d at 745.

The summary judgment evidence put forth by Devon and Perdido pertaining to Bremer's acknowledgment claim consists of Bremer's demand letter, several emails between the parties sent between March 2017 and May 2017, and a voided check that Devon issued. Perdido asserts that these communications establish that Devon unequivocally acknowledged its debt to Bremer and, thus, that the trial court erred in granting Devon's summary judgment motion on this contention and denying Perdido's motion. Conversely, Devon contends that the summary judgment evidence merely establishes that the parties were engaged in an ongoing negotiation to determine what, if anything, Devon owed to Bremer.

i. *Devon's emails were signed*

We begin our analysis by determining whether Devon signed the emails that are part of the summary judgment evidence. The emails that Bremer contends show that Devon acknowledged the debt contained various signature blocks from

employees of Devon. The signature block for emails on March 2, 2017, and May 2, 2017, were as follows:

Cherish

**Cherish K. Ralls**
**Counsel**
**Devon Energy Center**

The signature blocks for emails on April 10 and May 3, 2017, were as follows:

**Cherish K. Ralls**
**Counsel**
**Devon Energy Center**

The signature block for an email on April 11, 2017, was as follows:

Kristin Milster
Division Order Analyst
Devon Energy Production Company, LP (DEPCO)

And an email on April 12, 2017, was simply signed: "Cherish."

Generally, a record or signature cannot be denied legal effect "solely because it is in electronic form." TEX. BUS. & COM. CODE ANN. § 322.007(a) (West 2023). If a law requires a record or signature to be in writing, an electronic version of either will satisfy that requirement. *See id.* § 322.007(c)–(d). In this regard, the Texas Uniform Electronic Transactions Act (TUETA) defines an "electronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." *Id.* § 322.002(8).

There is a split of authority concerning whether a signature block on an email constitutes a signature. In *Cunningham v. Zurich American Insurance Co.*, the Fort Worth Court of Appeals held that a signature block at the end of an email was not a signature. 352 S.W.3d 519, 529–30 (Tex. App.—Fort Worth 2011, pet. denied). The court reasoned that there was nothing to show that the signature block was typed

by the sender "and not generated automatically by her email client." *Id.* at 530. The court further noted that there was no indication that the sender intended for her signature block to be her signature. *Id.*

In *Williamson v. Bank of New York Mellon*, the court applying Texas law held that the signature block of an email was sufficient to qualify as a signature under the Texas Business and Commerce Code. 947 F. Supp. 2d 704, 709–10 (N.D. Tex. 2013). The court concluded that a manually typed name on an email constitutes an electronic signature because it "represent[s] electronic symbols attached to a record and executed with the intent to sign the record as contemplated by TUETA." *Id.* at 709. The court further determined that an automatically attached signature block to an email also constitutes an electronic signature. *Id.* at 710–11. The court reasoned that the signature block is created by the email user rather than his or her email service, and that the email user intended for it to serve as his or her signature by creating it and setting up his email service to automatically attach it to his or her emails. *Id.* at 710. The court opined:

> [A]s a result of the "continued expansion" of email communication, a signature block at the bottom of an email has come to represent what a handwritten signature once represented: a means of identifying the sender, signaling that he or she adopts or stands behind the contents of the communication, and a method of ensuring that the communication is authentic.

*Id.* at 711. In reaching this conclusion, the federal court cited *Cunningham* and noted its disagreement with its holding.

The First Court of Appeals has gone a step further by holding that a name or email address in the "from" field of an email may be construed as an electronic signature for TUETA purposes. *Khoury v. Tomlinson*, 518 S.W.3d 568, 576 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The court noted that a name or email address in the "from" field "is a symbol logically associated with the email." *Id.*

(citing Bus. & Com. § 322.002(8)). The court also noted that "[t]he 'from' field functions to identify the sender of the email and authenticate the email as his act." *Id.* at 577. The court in *Khoury* also cited *Cunningham* and noted its disagreement with its holding. *Id.* at 577–78. Additionally, the court in *Khoury* noted its approval of the holding in *Williamson*. *Id.* at 578.

The reasoning utilized by the court in *Williamson* is persuasive. As noted by the court, signature blocks are generated by the email user and not the user's email client or service. *Williamson*, 947 F. Supp. 2d at 710. As noted by the court, a signature block at the end of an email has come to represent what a handwritten signature on a letter once represented. *Id.* at 711. Accordingly, we conclude that either a typed name or a signature block at the end of an email is sufficient to constitute a signature. *See id.* Because each of the emails proffered as summary judgment evidence contains either a typed name or a signature block from an employee of Devon, each contains a sufficient signature under Section 16.065 of the Civil Practice and Remedies Code.

## ii. *The text of the emails*

Perdido's attorney, Kyle K. Wittenbraker, wrote a demand letter to Devon on behalf of Bremer dated February 16, 2017. On behalf of Devon, its counsel, Cherish K. Ralls, wrote an email to Wittenbraker on March 2, 2017, in response to the demand letter. Ralls's response read:

> We are in receipt of the 91.404 request for Mr. Bremer. Devon has reviewed through [sic] the records and while there are few [sic] discrepancies in your correspondence that I will address later, we do feel that we can go ahead and get the funds paid to Mr. Bremer due and owing through Jan 1, 2016 revenues. This all said, I would request an additional 30 days for us to be able to correctly have the entries manually adjusted. This would make check write [sic] for the payment in mid April.

36

Please let me know by Tuesday if this accommodation is acceptable to Mr. Bremer?

Devon contends that this email does not constitute an unequivocal acknowledgment because it noted discrepancies in Wittenbraker's demand letter and because it stated that Devon only had a "feeling" that funds would be paid. Devon further asserts that it did not express a willingness or intent to pay Appellant because it was determining what amounts may be owed.

On April 10, 2017, Ralls wrote an email to Wittenbraker that stated: "Attached is a division order for Mr. Bremer to execute. The sooner that we get this signed the sooner we can put him in pay for those past amounts. Contact Kristin or me with questions." Devon contends that this email did not acknowledge the alleged debt to Bremer and it provided no ascertainable amount.

Wittenbraker replied on April 11, 2017, in an email stating that Bremer executed the division order and had sent it back by overnight mail. Wittenbraker also inquired: "Can you please provide an estimate as to the amount he will be paid?" On behalf of Devon, Kristin Milster replied by email on April 11, 2017 as follows: "The approximate amount that will be disbursed to Mr. Bremer is $268,500 pending final adjustments." Devon contends that this email did not constitute an unequivocal acknowledgement of the debt and that, because the email says "pending final adjustments," the amount of debt owed is not readily ascertainable. In this regard, Devon points to deposition testimony wherein its representative testified that at the time the email was sent, it was still determining what amount, if any, Bremer would receive.

On April 12, 2017, Ralls again emailed Wittenbraker, stating as follows:

We have received the division order from Mr. Bremer. Given the amount involved with this payment and that the declaration of heirship for Mr. Bremer's interest is close to be [sic] decided, we will plan to

send Mr. Bremer's payment as soon as the order for heirship is entered later this month.

Devon asserts that this email does not make an unequivocal acknowledgement of a debt owed to Bremer because it was conditioned upon the result of the heirship proceeding.

On May 1, 2017, the County Court at Law of Ector County entered its judgment declaring heirship wherein it determined that Bremer owned 1/4 of the Bray Interest. Following the entry of the judgment declaring heirship, Wittenbraker emailed Ralls and Milster on May 2, 2017, asking them when Bremer could expect to be paid. Ralls emailed Wittenbraker that day in response, stating: "A check was cut payable to Mr. Bremer but it was placed on hold waiting on the pending order and hearing. Now that we have received the order on heirship, we should be able to release this payment to him this week."[10] Devon asserts that its act of not sending the check indicates that it did not unequivocally acknowledge its indebtedness to Bremer.

On May 3, 2017, Ralls again emailed Wittenbraker stating as follows:

Attached is an acknowledge and release that I am including with Mr. Bremer's check. I expect to be able to send it out tomorrow. We would request that he sign the attached document and return it as soon as he can. Please let me know if you have any concerns with the acknowledge and release language in the document.

Devon asserts that this email conditioned payment on Bremer's execution of the release that accompanied the email. Wittenbraker replied as follows to the email:

I am adapting the earlier release we used when [Smitherman] got his partial payment for your review. Once we approve the form of release for Mr. Bremer, I am sure Mr. Smitherman will be more than happy to

---

[10]The summary judgment evidence contains a voided check entry indicating that Devon issued a check on April 15, 2017, for $268,521.17, but that it subsequently voided the check.

execute a similar release for the balance of the funds he is owed. Do you know when that check (Mr. Smitherman) might be issued?

On May 4, 2017, Ralls again emailed Wittenbraker, stating as follows:

> My apologies but on the release I sent yesterday, we miscalculated the amount actually due Mr. Bremer within the statute of limitations period for 4 years from the date of notice to the date of production. I hope to have an updated number for you on this and also let you know what the number for Mr. Smitherman, Jr. will be.

The May 4, 2017, email was the first time in the correspondence between Devon and Wittenbraker wherein Devon referred to limitations in its calculation of unpaid royalties it owed to Bremer. A Devon representative testified by deposition that at some point Devon received an email from one of the Watson Group's attorneys. In that email, Devon learned that it had a statute of limitations defense with respect to Bremer's claim for unpaid royalties. Devon then decided to assert limitations.

Devon takes a divide-and-conquer approach by challenging each of its emails separately to assert that none of them, standing alone, is sufficient to constitute the acknowledgment of its indebtedness to Bremer. However, the emails must be construed together along with the emails from Wittenbraker to ascertain the nature of the ongoing discussion between Devon and Bremer. A case that is instructive on this point is *Hutchings v. Bayer*, 297 S.W.2d 375 (Tex. App.—Dallas 1956, writ ref'd n.r.e.). In *Hutchings*, the court considered two letters together in determining that the defendant acknowledged a readily ascertainable debt. 297 S.W.2d at 377–78. The first letter in *Hutchings* stated that "[the plaintiff] has discussed with me the matter of your indebtedness to him, the amount being in the neighborhood of $20,000." *Id.* at 377. In the second letter, the defendant stated that "[t]he latter part of this week or next you will receive a payment. I have not denied my obligation . . . ." *Id.* In concluding that these letters sufficiently acknowledged the

debt, the court stated that "these two letters are to be considered together, the subject of discussion undoubtedly being defendant's indebtedness." *Id.* at 378.

Devon relies on its internal discussions to contend that it did not acknowledge its indebtedness to Bremer. However, these discussions concerning Devon's hesitancy to pay Bremer were not revealed to Wittenbraker. Our focus is on Devon's intentions as expressed in the writings that were conveyed to Bremer, rather than Devon's subjective beliefs or its internal discussions. *See Murphy Expl. & Prod. Co.-USA*, 560 S.W.3d at 108.

The context of the written communications between Devon and Wittenbraker prior to May 4, 2017, indicate that Devon believed Bremer's claim for unpaid royalties was legitimate. The emails demonstrate a willingness to pay him after two conditions were met—the entry of the judgment declaring heirship and his execution of division orders. Both of these conditions were met prior to May 4, 2017. Thus, Devon's reliance on these conditions to assert that its acknowledgement of its obligation to Bremer was equivocal is misplaced.

*Bright & Co. v. Holbein Family Mineral Trust* aids our analysis. In *Bright*, the San Antonio Court of Appeals was tasked with determining whether Bright acknowledged a debt to the Holbein Trust for unpaid royalties. 995 S.W.2d at 745–46. In concluding that Bright acknowledged its indebtedness to the trust for unpaid royalties, the court relied on a letter Bright sent the trust's attorney and a fax Bright sent to the trust. *Id.* The letter provided as follows:

> To update you with our progress, this will advise that we have conducted a search of the records of Jim Hogg County. We found no record of any conveyance out of the Holbein family that would cause their ½ (of 1/4) royalty to diminish. As a result, I have consulted with a representative of the Major family (owner of the other ½ of the royalty) for a possible explanation. In addition, we are searching our records for other possible explanations. We are also accruing information as to the exact month and year, (Mr. Holbein advised us it

40

was 1987), that royalty payments ceased and further, the amount of production/income that is involved. Please bear with us as we have every intention of seeing that this matter is resolved. Please forward a copy of this letter to Mr. Holbein with our appreciation for his patience. Should you have any questions, please let me know.

*Id.* The fax contained production figures and showed a "net due Holbein" in a specific dollar amount. *Id.* at 746. With respect to Bright's letter, the court stated as follows:

> [Bright's] letter acknowledged the justness of the debt and implied that the Holbein family was entitled to the unpaid royalty payments. The letter also stated that Bright had found nothing to indicate that the Holbein's interest had diminished. It further stated that Bright had every intention of resolving the matter, which implies a willingness to pay the debt.

*Id.* The court determined that Bright's letter and fax amounted to an acknowledgement of its debt to the Holbein trust for unpaid royalties. *Id.*

Here, Devon's emails to Bremer from March 2, 2017, through May 3, 2017, repeatedly assured Bremer that Devon would pay him for unpaid royalties without any reference to limitations barring any portion of its obligation to Bremer. Devon also told Bremer in these emails the approximate amount he would be paid. Devon went so far as to send division orders to Bremer to execute and tell Wittenbraker that it had already cut a check to Bremer. Thus, Devon went further than the defendant in *Bright* in acknowledging the justness or existence of its obligation to Bremer for unpaid royalties and its willingness to honor that obligation. *See Stine*, 80 S.W.3d at 591; *Bright & Co.*, 995 S.W.2d at 745–46. Therefore, the combined force of all of Devon's emails to Bremer from March to May 3, 2017, constitutes an acknowledgement of its indebtedness to Bremer for unpaid royalties irrespective of limitations. Therefore, we reverse the trial court's grant of Devon's motion for summary judgment on the matter of its acknowledgment of its debt to Bremer and

render judgment in favor of Bremer to the effect that, from March to May of 2017, Devon acknowledged its debt to Bremer.

### D. *Disposition*

We sustain Perdido's third issue with respect to Smitherman's claim for unpaid royalties for production occurring after October 2013 and Bremer's claim for unpaid royalties. We overrule Perdido's third issue with respect to Smitherman's claim for unpaid royalties for production occurring before October 2013.

### IV. *Smitherman's Alternative Claim for Fraudulent Inducement*

Perdido's fourth issue concerns its alternative claim that Devon fraudulently induced Smitherman to enter into the release agreement. Specifically, Perdido asserts that Devon fraudulently induced Smitherman to execute the release agreement by representing to him that it would pay all amounts due and owing to Smitherman for unpaid royalties (less the $50,000 payment to Smitherman). Perdido asserts that Devon had no intention of paying Smitherman anything more than $50,000 and that Devon's action induced Smitherman to delay filing suit against Devon.

"Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentation." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). The elements of fraudulent inducement are: "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on, and (5) which caused injury." *Id.* In order for fraudulent inducement to exist, there must be a promise of some future performance "made with a present intent not to perform." *Id.* (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (op. on reh'g)).

In many respects, Smitherman's claim for fraudulent inducement mirrors its claim of equitable estoppel that we addressed above in discussing Devon's limitations defense. As with Smitherman's equitable estoppel claim, Smitherman's fraudulent inducement claim is premised on an accrual date of March 6, 2013, for unpaid royalties for production occurring before that date. We have rejected Perdido's claim of a delayed accrual date by determining that limitations for unpaid royalties accrued on a monthly basis as production occurred. We have also noted that because Perdido did not contact Devon about Smitherman's claim until November 2016, Devon's conduct could not have delayed the timely filing of suit for production occurring prior to November 2012. That same principle is applicable to Smitherman's claim for fraudulent inducement. Accordingly, we direct our attention to Smitherman's claim for unpaid royalties for production occurring from November 2012 to October 2013.

Smitherman's fraudulent inducement claim suffers the same fate as his equitable estoppel claim because it ignores the language in the release agreement that any further payment to Smitherman would be adjusted "within any applicable statute of limitations." Thus, by its express terms, the release agreement contemplated that Devon could assert any applicable limitations defense. In this regard, there is a provision in the release agreement in bold text wherein each party acknowledged that it had read the release and had consulted with legal counsel regarding it. Therefore, we must assume that Smitherman knew that his recovery for unpaid royalties may be limited by the applicable statute of limitations. This provision of the release agreement to the effect that Devon preserved its limitations defense precludes Smitherman's claim for fraudulent inducement. We overrule Perdido's fourth issue.

## V. *Devon's Conditional Cross-Point*

Devon presents a conditional cross-point wherein it asserts that the trial court did not dispose of Devon's cross-claim against the Watson Group for indemnity or its counterclaim against Perdido and Smitherman. Devon based its cross-claim for indemnity against the Watson Group based on the terms of the division orders. Devon based its counterclaim against Perdido and Smitherman on the allegation that they breached the release agreement by filing suit against Devon for unpaid royalties for past production.[11] Devon also sought to be reimbursed for the $50,000 that it paid to Smitherman if it is determined that Smitherman does not own the disputed interest to which the payment related. Devon's cross-point is conditioned on a reversal of the summary judgment granted in Devon's favor.

Contrary to Devon's suggestion, the trial court disposed of Devon's cross-claim and counterclaim because the trial court entered a final judgment that disposed of all parties and all claims in the underlying case. *See Patel v. Nations Renovations, LLC*, 661 S.W.3d 151, 154 (Tex. 2023) ("[C]ourts will deem a judgment without a trial to be final '(1) [when the judgment] actually disposes of every pending claim and party or (2) [when] it clearly and unequivocally states that it finally disposes of all claims and parties, even if it does not actually do so.'" (alterations in original) (quoting *In re Guardianship of Jones*, 629 S.W.3d 921, 924 (Tex. 2021))). Here, the trial court entered a summary judgment order that concluded with the following statement: "This order is final, appealable, and disposes all claims between all parties." *See id.* Thus, the trial court disposed of Devon's cross-claim and counterclaim.

---

[11]We have determined that, as a matter of law, Perdido and Smitherman did not breach the release agreement by filing suit against Devon for unpaid royalties from past production.

Devon appears to be asserting that, in the event of a reversal, the case should be remanded for the consideration of its cross-claim against the Watson Group and its counterclaim against Perdido and Smitherman. As set forth herein, we are remanding the following claims for trial: Smitherman's claim for unpaid royalties for production occurring after October 2013 and Bremer's claim for unpaid royalties. In doing so, we are not limiting the remand by special instructions. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630–31 (Tex. 1986); *Simulis, L.L.C. v. Gen. Elec. Cap. Corp.*, 392 S.W.3d 729, 734 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Hudson*, 711 S.W.2d at 630). As noted in *Simulis*: "Generally, when an appellate court reverses and remands a case for further proceedings, and the mandate is not limited by special instructions, the effect is to remand the case to the lower court on all issues of fact, and the case is reopened in its entirety." 392 S.W.3d at 734. This principle is particularly applicable in the context of an appeal involving a summary judgment because the appellate court is limited in its consideration of the relevant issues and facts. *See Hudson*, 711 S.W.2d at 630–31; *Eagle Supply & Mfg. L.P. v. Landmark Am. Ins. Co.*, 630 S.W.3d 342, 353 (Tex. App.—Eastland 2021, pet. denied). Accordingly, Devon will be permitted to pursue its cross-claim and counterclaim to the extent that they are not inconsistent with this opinion.[12]

*This Court's Ruling*

The trial court's summary judgment in favor of Devon on Smitherman's claim for unpaid royalties for production occurring after October 2013 and Bremer's claim for unpaid royalties is reversed, and this cause is remanded for further proceedings consistent with this opinion. The remainder of the trial court's summary judgment—

---

[12]"Under the law-of-the-case doctrine, questions of law decided on appeal will govern the case throughout its subsequent stages." *Eagle Supply & Mfg. L.P.*, 630 S.W.3d at 354 (citing *Hudson*, 711 S.W.2d at 630). Here, our interpretation of the Enterlex judgment, our interpretation of the *Gavenda* holding, our interpretation of the release agreement, and our determination that Devon acknowledged its indebtedness to Bremer are questions of law that we have decided in this appeal.

with the exception of its disposition of Devon's cross-claim and counterclaim—is affirmed.

JOHN M. BAILEY

CHIEF JUSTICE

May 18, 2023

Panel consists of: Bailey, C.J.,
Wright, S.C.J.,[13] and Marion, S.C.J.[14]

Trotter, J., and Williams, J., not participating.

---

[13]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.

[14]Sandee Bryan Marion, Senior Chief Justice (Retired), Court of Appeals, 4th District of Texas at San Antonio, sitting by assignment.